NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HOWARD–COOPER CORPORATION,
Respondent.

No. 15937.

United States Court of Appeals
Ninth Circuit.

Oct. 6, 1958.

Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Atty., NLRB, Washington, D. C., Louis S. Penfield, Atty., NLRB, San Francisco, Cal., for petitioner.

J. P. Stirling, Portland, Or., for respondent.

Before HEALY, FEE and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

There is before this Court a petition of the National Labor Relations Board to enforce an order issued against Howard-Cooper Corporation, hereinafter called the Company, which Company was found by the Board to have violated Section 8 (a)(1) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1, 5), by offering employees material inducements to repudiate union representation, by fostering an anti-union petition, by threatening a shutdown in the event of unionization, and by refusing to bargain with the Union representing a majority of the employees.

The following is a summary of the evidence upon which the Trial Examiner made findings against the Company, which findings were adopted by the Board.

Respondent Company sells industrial and farm machinery in Washington and Oregon. One of the plants operated by the Company was at Central Point, Oregon. The Company raises no question that its activities were not in interstate commerce.

In November, 1955, at a Union meeting seven of the twelve employees of the Company signed Union authorization cards, but requested the Union to delay notifying the Company of its designation as bargaining representative until after the Christmas and New Years holidays.

This was done. On January 4th the Union wrote a letter to the Company at its Central Point plant, stating that it represented a majority of the employees and requested recognition and negotiations for a contract. The Company made no reply to this letter and on January 10th the Union filed a representative petition with the regional office of the National Labor Relations Board.

On January 11, 1956, Frank S. Parker, vice-president and general manager of branch operations for the Company, while on a tour of the various plants of the Company, visited the Central Point branch, having received knowledge of the Union's letter of January 4th. He denied that at that time, however, he had then learned of the filing of the representative petition. On that day the employees were called in to the plant office by the management and Mr. Parker addressed them at a meeting which, by various estimates, lasted from a half hour to an hour and a quarter. There was testimony that Parker stated at this meeting that he had heard that there was some trouble and dissatisfaction at the plant and that while he was not there to make any anti-union talk, that the plant had had very little labor trouble and that the doors of the Company were always wide open for anybody that had a so-called "beef" about working conditions. Witnesses testified that Parker said that unions created hard feelings and that "they created things like guys standing outside ready to beat up on the families or yourself." He did not make any statement challenging the claim of the Union that they represented a majority of the employees. After some further conversation he then asked those present what their grievances were. There seemed to be considerable reluctance upon the part of the employees to speak up. Parker stated that the Company had been considering making a ten cent per hour wage raise throughout its entire plants, but that due to this union trouble now they did not know whether they could do that in the Central Point plant. Upon further inquiry as to grievances, some employee mentioned that they wanted to have a "coffee break." Parker said that he felt a coffee break would be all right, and turned to one of his assistants and asked him to look into the matter as far as getting equipment necessary to give the employees a coffee break. (Actually a coffee break was installed the next day, on January 12th.) Another employee complained of the policy of the Company of not giving paid holidays until the employees had worked for a period of six months. Parker inquired of his assistants as to whether that was true, and when they verified the statement that it was true, Parker said that it wouldn't be that way any more,—that he would take care of that right there. Present at this meeting with Parker was Mr. Thomas, his assistant, and Mr. Thrash, a shop foreman at the Central Point plant. Mr. Parker further stated that he understood that the employees had signed representation cards, and while it was their privilege to do so, he didn't know why they would want somebody else to represent them when the doors of "our office were always open to any grievances as far as the employees were concerned." After some further discussion, the meeting terminated.

The next morning, January 12th, one of the employees, Squire, talked with Mr. Thrash and in general conversation "agreed that one way they could get the raise was * * * if they didn't have any union representing them at that time, that they could file a petition or letter * * * and everybody sign it which was interested * * * and send a copy to the Board, one to the Company and one to the Union's representative."

On the same day, employee Brown, who had not been present at the January 11th meeting, was asked by Thrash to come to his office and was there informed as to what had happened the previous day. After discussion of the possibility of getting the raise, Brown testified:

"Question: You are saying as a result of your discussion with him it

was determined between the two of you that the appropriate thing was to prepare a petition?

"Answer: Yes."

Thereafter, that day, Brown prepared a petition which was later typed in Mr. Thrash's office and was posted up "there where everybody could see it as they punched out." This petition generally provided that no action be taken regarding union organization and representation and stated that the employees had met with the Company officials and do not desire to make a union affiliation at this time. There was a place left for signatures and at the end of Thursday, February 12, there were only two signatures on it. By the next day, however, after one of the employees had talked to a Union official and been informed by him that probably the management wanted to find out who was signed up with the Union and advised the employees to sign, a number of them did so, making a total of nine names.

Another employee testified that Mr. Thrash had told him on January 13th that once before at the Central Point plant the employees had voted for a Union and "they just closed the shop down."

Another employee testified, when asked as to his conversation with Mr. Thrash on the evening of January 11th, "What he told me, I mean as near as I can recall, that rather than have a union-recognized shop, they would give away a franchise. I don't know—I don't recall his exact words, but that is a summary of it." This witness further testified that Thrash said later on in this conversation that he could pass this information on if he wished.

It was shown that when Mr. Parker visited other Company plants on this tour, that he had not there mentioned any proposed wage increase to the employees. The decision to put in a wage increase was made on January 12th and it was put into effect on that day. However, the employees at the Central Point plant were given no formal notice of it, but learned of the raise when they received their next pay check.

Respondent contended that there was no sufficient showing that the Union represented a majority of the employees.

It was apparently undisputed that the plant had not to exceed twelve employees who were in the appropriate bargaining unit. Six of these testified before the Trial Examiner that they had signed cards on or before November 16, 1955, authorizing the Union to act as their bargaining agent. Another employee, Hachenberg, was at the time of the hearing serving National Guard duty and was not available to testify. Bishop, another employee, testified that Hachenberg gave him an authorization bearing Hachenberg's name to bring to the Union meeting on November 16, 1955, and Whiteside, the Union representative, testified that Bishop gave him an authorization bearing Hachenberg's name at that time. Hachenberg arrived late at the Union meeting, being detained from earlier attendance by National Guard duty.

Bishop further testified that Hachenberg signed the anti-union petition of January 12th after Bishop had told him, Hachenberg, that the Union representative, Whiteside, had advised that all those who had authorized the Union to be their bargaining representative should sign it.

On the basis of all of the evidence the Trial Examiner concluded that on January 11, 1956, the Union had been designated by a majority of employees in an appropriate unit to represent them; that the Company had then refused to recognize and bargain with the Union; had offered inducements to employees as a reward for repudiating Union representation; had participated in and fostered an anti-union petition; and had interfered with, restrained and coerced its employees in violation of § 8(a)(1) and (5) of the Act. These conclusions were concurred in by the Board.

This Court must test the Board's order in the light of Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Its findings can be set aside only if a view of the

whole record shows there is no substantial evidence to support them.

In National Labor Relations Board v. Parma Water Lifter Co., 9 Cir., 1954, 211 F.2d 258, this Court held that the promise of wage increases if union forces were defeated, threats that the plant would be sold if the Union were successful, and management's support of an anti-union petition were sufficient to show a violation of § 8(a)(1) and (5) of the Act.

National Labor Relations Board v. Trimfit of Calif., 9 Cir., 1954, 211 F.2d 206, and National Labor Relations Board v. Idaho Egg Producers, 9 Cir., 1956, 229 F.2d 821, are authorities for the rule that a refusal to bargain with a union representing a majority of the employees is an unfair labor practice.

We find that there is sufficient evidence on the whole record to support the Board's order. It is therefore ordered that the order of the Board be enforced.