ROCKY MOUNTAIN NATURAL GAS COMPANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 7291.

United States Court of Appeals Tenth Circuit.

Jan. 28, 1964.

Russell P. Kramer of Calkins, Rodden & Kramer, Denver, Colo., for petitioner.

Joseph C. Thackery, Washington, D. C. (Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost and Allison W. Brown, Jr., Washington, D. C., on the brief), for respondent.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

LEWIS, Circuit Judge.

This case reaches the court upon the petition of Rocky Mountain Natural Gas Company, Inc., to review and set aside in part an order [1] of the National Labor Relations Board requiring Rocky Mountain to take remedial action for violation of section 8(a) (1) and (3) of the Labor Management Relations Act (29 U.S.C. § 158(a) (1), (3)). The Board cross-petitions for enforcement of its order. Rocky Mountain contends that the record as a whole does not support the Board's order in those aspects where the Board refused to follow the recommendations of its trial examiner and particularly in regard to the Board finding, contrary to that of the trial examiner, that petitioner had discriminatorily discharged two employees, Welch and Dick, for protected union activity and in violation of section 8(a) (3) of the Act.

Rocky Mountain is a Colorado corporation engaged primarily in the distribution of natural gas to industrial and domestic consumers. Prior to 1958 its distribution area was restricted to a limited area on the Western Slope in Colorado. In 1959, Rocky Mountain bought the assets of Domestic Propane Company of Delta, Colorado, a company engaged in the sale of liquified petroleum to like consumers. Rocky Mountain retained the employees of Domestic, chiefly gasfitters, and thereafter the company operated in divisions. One division, under the regulatory control of the Public Utilities Commission of Colorado, continued the distribution of natural gas; another division, free of state control, continued the sale of propane and also performed the labor necessary to complete conversions in the systems of those consumers who could be persuaded to change from other fuels to natural gas. Separate records were kept by management for each operational division of the company.

As was to be expected, more than half of Rocky Mountain's potential customers converted to natural gas as soon as that fuel became available. Thereafter the number of conversions slackened and the need for labor crews became less for such work. Very few conversions were made during the heating season.

In late 1960, the company had to begin transferring funds from other divisions to the propane division in order to meet payrolls and other costs. The propane division had a net operating loss of $14,-229.00 for the year 1961. A study of the over-all conditions led management to the decision to make a transfer of employees and a reduction in the number of employees working as gas-fitters for the propane division in the Delta area. The reduction was originally planned for November, 1961, but was later delayed and was actually effectuated after Christmas. From this broadly stated operational background and supplemented by much detail, the trial examiner found that economic justification existed for a cut in the number of employees working as gas-fitters at Delta; the decision of the Board criticizes but does not reject the finding and the Board decision is not based upon lack of economic need. We unqualifiedly accept the premise of the existence of economic justification for a reduction of force. The premise does not, ipso facto, negative a violation of the Act in the method of accomplishing a reduction in labor force.

During the period of operational adjustment and expansion of Rocky Mountain on the Western Slope the employees in the propane division were justifiably concerned about their own welfare and security. The employees were unorganized and were not enjoying some benefits available to employees in other divisions. After rather a prolonged period of informal discussions among the employees, followed by a series of more formal meetings, a majority of the employees voted to, and did, organize a union in November, 1961.[2]

Management, of course, became aware of the employee organizational efforts; and the employees were made aware of the company's claim of economic distress. Each of the section 8(a) (1) violations

premising the Board order is based upon a different incident occurring during this period when conflict of interest seems to be inevitably assumed.

The report of the trial examiner analyzes in commendable detail each such incident and concludes that in some instances the conduct of management constituted an unfair labor practice and that in other instances it did not. The Board adopted the report to the extent it determined the existence of violations but rejected the recommendation of the examiner in each instance where the acts of management were reported as not violations. From our examination of the record we note nothing novel or unusual regarding this aspect of the case which would require a detailed discussion of the facts or law. Such discussion is usually profitless. N. L. R. B. v. Twin Table & Furniture Co., Inc., 8 Cir., 308 F.2d 686. Sufficient it is to say that the record as a whole readily supports the order of the Board in those matters in which it follows the report; and, in those matters where it does not, with one rather minor exception, the Board has but drawn different inferences from the evidence.[3] This the Board may do even though the finding of the examiner is not clearly erroneous. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Wichita Television Corp., 10 Cir., 277 F.2d 579. The single exception lies in the finding by the Board that an inquiry made by the company service manager Boyd from the employee Welch as to the names of the union officers was coercive. The trial examiner had found the inquiry to be but casual, without coercive effect in intent or fact, and that at such times Boyd did not have the inherent capacity to coerce Welch. The Board finds the question to be coercive because of the "various other violations by the Respondent." "Carry-over" intent is an inadequate premise

2. Rocky Mountain Gas Workers Union, an independent labor organization. At a later time, the members voted to disband their organization.

3. The Board also added some specific violations which were fully developed as issues at the hearing but which the examiner treated as not within the charges. We find no error in this regard.

for the determination of a violation of the Act where the accused conduct is inherently innocent and harmless. The record does not support the Board in this particular.

■ The circumstances surrounding the discharge of employees Welch and Dick presents more than a routine controversy. The trial examiner found the discharges to be non-discriminatory and the Board again found otherwise and that a section 8(a) (3) violation was involved. Each finding considers the undisputable facts that both Welch and Dick were qualified workers from a technical view and both were very active in union activities. Dick was president of the Union and Welch was treasurer. And certain it is that the discharge of union officers during a period of union activity when the officers are qualified workers is a circumstance of suspicion which may rise to a justified inference of violative discrimination. But it is equally certain that active union participation by the most qualified employee is not an impenetrable shield against discharge. Union activity cannot be the basis of discharge but active unionists may be discharged for other reasons. E. g., N. L. R. B. v. South Rambler Co., 8 Cir., 324 F.2d 447; N. L. R. B. v. United Parcel Service, Inc., 1 Cir., 317 F.2d 912; N. L. R. B. v. Local 294, International Bhd. of Teamsters, 2 Cir., 317 F.2d 746. And in the case at bar the issue must thus be determined by the degree of significance to be given to Rocky Mountain's explanation of the reason for the discharge of Welch and Dick.

As earlier stated, economic conditions justified a reduction in force of the gasfitters employed by Rocky Mountain. Witnesses for the company, expressly credited by the trial examiner, explained the plan formulated by management to accomplish the reduction. Each company district in the propane division was assigned a quota of the number of men that could be retained. Each district manager was allowed to select the men he wanted to retain or be transferred to his district. The last district to act under the plan was the district at Delta. The quota for the district was three pipefitters. Five were then employed at Delta: Lewis, Chappell, Morris, Welch and Dick. Each was a member of the Union and four were officers. Dick was president, Chappell was vice president, Lewis was secretary and Welch was treasurer. Each of the five was an experienced technical worker. Lewis, Chappell and Morris were retained and Welch and Dick discharged. The witness Sieverson, Delta district manager, testified that he made his selections based upon his opinion of ability, versatility and public relations capacity. He though Welch had some weakness in customer relations and he told of an instance of personal disagreement with Dick regarding a pipe installation where Dick had challenged his judgment. The witness stated unequivocally that union matters had not affected his judgment.

■ The probative force that should be given an examiner's report reaches its highest significance when an issue turns upon credibility. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The examiner here credited the testimony of witnesses who completely negatived the claim of discrimination in the discharge of Welch and Dick. Although the operation of the plan resulted in the discharge of two qualified men who were active in union affairs, and thus accomplished a suspect result, it is apparent that the discharge of any two of the five employees would be equally suspect when examined by circumstance alone. The acceptance by the Board of circumstance in view of the trial examiner's determination of credibility does not find substantial support in the record.

The order of the Board is set aside to the extent it finds the Boyd-Welch inquiry to be violative of the Act and the discharge of Welch and Dick to be violative of the Act; in all other regards the petition of the Board for enforcement of its order is granted.