NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WESTERN MEAT PACKERS, INC., Respondent.

No. 8457.

United States Court of Appeals Tenth Circuit.

Nov. 3, 1966.

Malcolm D. Schultz, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel; Dominick L. Manoli, Associate Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N. L. R. B., were with him on the brief), for petitioner.

Harold B. Wagner, Denver, Colo., for respondent.

Before PICKETT and HICKEY, Circuit Judges, and CHRISTENSEN, District Judge.

CHRISTENSEN, District Judge.

The case is before us on petition of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act[1] for enforcement of its order[2] based upon findings that Western Meat Packers, Inc., had violated § 8(a) (1)[3] and (3)[4] of the Act by discharging an employee Keith Warenski for engaging in union and other concerted activity, and in further violation of subsection (1) by interrogating employees about, and threatening to discharge them because of, such activities. The respondent Western defends primarily upon the contention that the evidence before the Board was insufficient to sustain the order. We have examined the record to determine whether the Board's decisive findings of fact are supported by substantial evidence on the record considered as a whole.[5]

In April, 1964, the Amalgamated Meat Cutters and Butchers Workmen of North America, Local Union No. 634, AFL–CIO, was engaged in an organizational campaign among Western's employees.[6] On May 11, 1964, the Union filed charges with the Board alleging that Western's conduct had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by § 7 of the Act. Neither in oral argument nor in his brief does counsel directly question the sufficiency of the evidence to support the Trial Examiner's report including subsidiary findings adopted by the Board, to the effect that in May, 1964, in violation of § 8(a) (1) of the Act, Western interrogated its employees concerning their attendance at Union meetings and other Union activities and threatened them with discharge if they became affiliated with or assisted the Union. The identification with management of certain employees making anti-union statements, questioned by Western, was not a determinative matter and in any event, on the basis of the evidence appropriately considered in the Examiner's report, we have no question concerning the sufficiency of the other evidence. There appears no occasion to

1. 29 U.S.C. § 160(e).

2. Reported at 152 NLRB 113.

3. 29 U.S.C. § 158(a). "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." (Section 157 of Title 29 provides in material part as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

4. "(a) It shall be an unfair labor practice * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

5. 29 U.S.C. § 160(e). Universal Camera Corp. v. National Labor Rel. Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); National Labor Rel. Bd. v. Tri-State Casualty Ins. Co., 188 F.2d 50 (10th Cir. 1951).

6. At that time in dispute was the issue whether the Union was then the lawful bargaining representative of Western's employees, later resolved by N.L.R.B. v. Western Meat Packers, Inc., 350 F.2d 804 (10th Cir. 1965), which denied enforcement of the Board's order for Western to bargain collectively with the Union.

further discuss this evidence, except to note that we have examined the record and have determined these findings to be amply supported.

Prior to adjudication of the May complaint, however, the Union and Western, with the approval of the Regional Director of the National Labor Relations Board, entered into a "settlement agreement" in which Western agreed, among other things, that it would not in any manner interfere with its employees in the exercise of their rights. Accordingly, prosecution of this complaint was discontinued. Because of the discharge of Warenski on June 19, 1964, the Board's Regional Director set aside this settlement agreement, and both Warenski's discharge and the prior circumstances are under review here. While the Board first considered the respondent's post-settlement conduct, we have reversed the process in this discussion so that with the matters not in serious dispute disposed of, we may now reach the critical issue whether the record supports the Board's findings and conclusions that Warenski's discharge violated the Act. Counsel for Western in his brief characterizes this as "the only substantive issue in the case," and we agree.[7]

■ We have determined on the record considered as a whole that there is substantial evidence to support the following findings contained in the report of the Trial Examiner and adopted by the Board.

Prior to June 19, 1964, it had been customary for the "kill floor" employees, including Warenski, to punch in and out together. If any employee finished his particular job first, he would help the others until all the work was completed. About June 19, 1964, the date of Warenski's discharge, Western's management was concerned with ways to improve pro-

duction. On this date the manager told the kill floor foreman that the employees were to punch out as soon as their particular jobs were finished, and the men were so instructed.[8] When the order was conveyed to Warenski by the foreman, Warenski indicated that he did not feel that he should be required to punch out earlier than others unless the entire crew was staggered on reporting in so that everybody would wind up the day with the same number of hours. The foreman referred him to the manager. Before the end of the day, and before he talked to the manager, Warenski discussed the matter with several other employees on the kill floor. It was the consensus that the new system was unfair and that it should be changed by staggering the punch-in times and that Warenski should talk to the manager. He did so shortly after he punched out, and the Board found that he was then speaking for the other employees concerned, as well as for himself, in suggesting that the working hours be staggered in a manner that would enable all employees in the department to draw the same wages. According to Warenski, the manager retorted that he was running the place and that Warenski was fired. The manager testified that Warenski made the statement that he didn't like the way the plant was being run and that "he wasn't going to put up with it." The Trial Examiner and the Board declined to credit the manager's conflicting version of this conversation. (The punch-out directive was not enforced after the day in question.)

Warenski, after his encounter with the manager, returned to the employees' dressing room and reported that he had just been fired. Then, accompanied by other employees, he went to the office to get his check. There the office manager gave him a slip of paper bearing the

---

7. There is no question as to jurisdiction, and no complaint made as to the remedies, as such, provided in the order.

8. The Board expressly recognized that the instructions for punching out were not directed solely at Warenski and were not motivated by anti-union considerations.

manager's signature which said in effect that Warenski had approached the manager and told him that he was tired of the way the kill floor was being run and was not going to put up with it anymore. After reading this, Warenski entered the manager's private office where the latter was talking to the foreman. Warenski tossed the paper on the manager's desk and told him, "This wasn't the reason I was fired." The manager said it was and an argument ensued, during which Warenski, losing his temper, told the manager, "I better not catch you uptown." Springing to his feet the manager replied, "Are you threatening me? Now I'm really going to hang you."—or words to that effect. The manager then instructed the office manager to bring in a paper that had been discussed previously between them. The statement was brought in, was dated May 22, 1964, and read in effect that Warenski had asked the foreman about that time to sign a paper to get the Union in the plant and when he refused Warenski said in front of all the kill floor employees, "As long as you will not help us get in the union—then we are not going to put out production—your production is going to get less and less." Warenski admitted having solicited the foreman to sign up with the Union but denied the latter part of the statement having to do with a slowdown in production. The foreman remained firm in his accusation. Another employee corroborated Warenski.

■ The Board determined that the written statement was not a true reflection of what had occurred between the foreman and Warenski in May.[9] The findings indicated that in fact Warenski had asked the foreman if he had ever worked in a union plant and when the foreman had replied in the affirmative, Warenski asked him if production was not better in union plants than it was at Western. The foreman had agreed that it was. Warenski then suggested that if the foreman did not sign up then he might later be blackballed from becoming a union member.

The Board held that the latter statement had nothing to do with Warenski's discharge, not having been communicated to management and not being a motivating factor in the discharge. It further rejected the manager's contention that Warenski immediately preceding the discharge had thrown down the gauntlet to him and stated that he wasn't going to put up with the way the plant was being run. It found that the initial discharge of Warenski was unjustified because his suggestion to the manager constituted a protected concerted activity, and that the subsequent additional charge and the statement produced by the manager were only a confirmation that the initial discharge was of dubious justification even in the manager's mind and at least in part was in retaliation for legitimate union activities on the part of Warenski.

■ We do not mean to indicate that the fact-finding with respect to motive was easy, or that necessarily we would have reached the same conclusions were we free to nicely weigh the evidence on initial impression. But acting within our own responsibility, we are of the opinion that on the whole record there is substantial evidence to support the crucial findings of the Board. It is true that the evidence on several important points is conflicting, but it was for the Board to resolve these conflicts, which we believe it did reasonably.

■ Counsel for respondent in his brief argues that the Board erred in relying on inadmissible evidence and going

9. Even though a discharge is motivated by an employer's good faith belief that the employee has engaged in misconduct in the course of a protected activity, if the belief is erroneous, the discharge may be violative of § 8(a) (1) of the Act. National Labor Relations Board v. Burnup & Sims, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).

outside the agreed issues. There is no substance to the former contention requiring discussion. The receipt of the "hearsay" testimony was either technically proper for the limited purpose for which it was received and utilized, or was in no sense prejudicial.[10]

■■ Western concedes that "The Board's summary of the evidence is generally consistent with the portions of the record cited," but contends that "It is incomplete and inaccurate because it omits some of the evidence which is contrary to its conclusions." To the extent that the detailed evidence lends itself to express consideration by principal categories in such reports, we have noted no omissions of significance. That Warenski's work had been criticized prior to his discharge, and that, as the Trial Examiner found, Warenski was somewhat of a "know-it-all", did not invalidate the finding that he had been discharged for his concerted and union activities, it being the province of the Board to weigh the evidence and make a selection between two reasonable but conflicting inferences.[11]

■ The claimed conflict stressed most by the respondent involved Warenski's application to the Colorado Department of Unemployment Security in which he stated the reason for his separation to be "Disagreement with the manager. He wanted me to quit before the rest of the guys did"; and the finding of the State Department of Employment that

"The claimant was discharged on 6–19–64, because he tried to tell the employer how to run his business." There were other similar statements received for impeachment purposes, and the Examiner took cognizance of all of them in his report. The statements were not necessarily irreconcilable but to the extent that they may have involved inconsistencies, their resolution by the Board was not unreasonable. And as between findings, as such, those of the Board rather than of the state agency, are controlling. See Independent Stave Company v. N. L. R. B., 352 F.2d 553 (8th Cir. 1965).

■ Western's assertion that in considering the claimed pre-discharge conduct of the respondent the Board went beyond the stipulated issues is refuted by the record.[12] It was appropriate to look to all of the circumstances surrounding Warenski's discharge. Such discharge having been determined to be in violation of the settlement agreement, that agreement constituted no bar to additional findings based on the prior conduct. Wallace Corporation v. National Lab. Rel. Bd., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944); N. L. R. B. v. Dressmakers Joint Coun., Int. Ladies' Garment W. U., 342 F.2d 988 (2d Cir. 1965).

■ Finally, the respondent contends that the Board was wrong as a matter of law in concluding that Warenski's discharge violated the Act, citing National Labor Rel. Bd. v. Miami Coca-Cola Bot-

---

10. Counsel for the respondent with commendable frankness says in his brief that "Some of it [the evidence] may have been inadmissible as hearsay or for some other reason, but it was of so little probative value that it does not justify any extended discussion."

11. The trial examiner noted: "There was further testimony by Clarke and Velasquez concerning Warenski's uneven work performance and contemptuous conduct which I find it unnecessary to relate in detail inasmuch as nothing was said of it at the time of Warenski's discharge, or in Respondent's statement to the Colorado State Department of Employment,

and because there is no evidence that it entered into the discharge decision itself."

12. "Trial Examiner: I notice there has been a settlement agreement in this case and the allegations in the complaint with respect to it are admitted. You don't have any evidence. Since the allegations are admitted, that's accepted as fact.

"Is it the General Counsel's position that there is anything other than the discharge that occurred subsequent to the settlement agreement in the way of unfair labor practices, or do you rely solely on the discharge to upset the settlement agreement?

"Mr. Fields: Yes. The latter is true."

tling Co., 222 F.2d 341 (5th Cir. 1955); Local No. 3, Etc. v. National Labor Relations Board, 210 F.2d 325 (8th Cir. 1954); and other cases which we consider inapposite to the one before us. Compare also N. L. R. B. v. R. C. Can Company, 340 F.2d 433 (5th Cir. 1965). Where, as here, the report of the Trial Examiner demonstrates careful consideration of the employer's basic contentions and a rational rejection of them, the record as a whole does not indicate any abuse of the administrative process through either substantial error or prejudice, and the findings find support in the record as a whole, they should be upheld notwithstanding minor discrepancies or non-prejudicial rulings concerning the admission of evidence. Duo-Bed Corporation v. N. L. R. B., 337 F.2d 850 (10th Cir. 1964). See also N. L. R. B. v. Bear Brand Roofing, Inc., 312 F.2d 616 (10th Cir. 1962); N. L. R. B. v. Lively Service Company, 290 F.2d 205 (10th Cir. 1961).

We are of the opinion on the basis of the facts thus effectually determined by the Board that it did not err in concluding that Western violated § 8(a) (1) and (3) of the Act by discharging Keith Warenski because he engaged in union and other concerted activities protected by § 7 of the Act,[13] and had theretofore violated subdivision (1), supra, by interrogating employees about, and threatening to discharge them by reason of union activities.

The order of the Board will be enforced.

13. The evidence of his initial discharge suggested most strongly that the concerted protest which Warenski relayed to the manager triggered his discharge. This alone would have constituted an unfair labor practice under the circumstances found by the Board, since the statute protects the right to engage not only in union activities as such, but other concerted activities for mutual aid or protection. National Labor Relations Bd. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); cf. Western Contracting Corporation v. N.L.R.B., 322 F.2d 893 (10th Cir. 1963). By isolating the circumstances of the initial discharge from those which occurred shortly thereafter in the manager's office, a subdivision (3) violation might be thrown into question. However, when all of these circumstances are considered together, the Board's finding that the discharge also had an anti-union motivation in violation of subdivision (3) appears not unwarranted.