**BETTS BAKING CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 8813.**

United States Court of Appeals
Tenth Circuit.

May 26, 1967.

William G. Haynes, Topeka, Kan. (O. B. Eidson, Philip H. Lewis, James W. Porter, Charles S. Fisher, Jr., Charles N. Henson, Peter F. Caldwell, R. Austin Northern, Roscoe E. Long and Brock R. Snyder, Topeka, Kan., on brief), for petitioner.

Morton Namrow, Washington, D. C. (Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost and Warren M. Davison, Washington, D. C., on brief), for respondent.

Before MURRAH, Chief Judge, HICKEY, Circuit Judge, and CHRISTENSEN, District Judge.

MURRAH, Chief Judge.

This case presents the familiar question whether on the whole record there is substantial evidence to support the findings of the National Labor Relations Board. The Board found that the employer violated § 8(a) (1) of the Act by coercively interrogating employees concerning union activities, threatening economic reprisals, instituting wage increase and retirement benefits, and encouraging and fostering employee with-

drawal from the union.[1] It further found that the employer violated § 8(a) (3) and (1) by discriminatorily discharging two employees for their union activities. The Board entered the conventional cease and desist order, and affirmatively ordered the employer to offer reinstatement to the two discharged employees, to make them whole, and to post appropriate notices. The Employer petitions for review and the Board cross-petitions for enforcement. We enforce.

The employer, Betts Baking Company, is engaged in Hutchison, Kansas, in the manufacture and wholesale of bakery products. At the time in question (mid-September, 1964–February, 1965) it employed 88 workers in its wholesale division, 13 of whom were transport drivers whose task it was to deliver baked goods on overnight runs from the Hutchison plant to various points in Kansas, unloading the goods in preordered amounts into smaller route trucks. About September 15, several of these transport drivers decided to try to organize for collective bargaining purposes. Union cards were acquired and signed by some. The employer's anti-union campaign allegedly took place in the ensuing months, and either because of the alleged anti-

union campaign or for some other reason the union in November withdrew its petition for certification.

Two of the found violations of 8(a) (1) are not controverted by the employer. Thus, no issue is taken with the finding that President Betts and Sales Manager Hilton openly questioned several employees concerning whether they and other employees had signed union cards.[2] Nor is it disputed that 8(a) (1) was violated when the employer encouraged employees to withdraw from the union.[3]

Of the findings which are disputed we consider first the alleged threats by the employer that economic reprisals would follow should the union organization drive be successful. Such activity, if proved, clearly constitutes a violation of 8(a) (1). See N.L.R.B. v. Beatrice Foods Co., 10 Cir., 183 F.2d 726; N.L.R.B. v. Bear Brands Roofing, Inc., 10 Cir., 312 F.2d 616. Three of the alleged threats were uttered by employee Van Stock, and were to the effect that there would be "some boys going up and down the road talking to themselves", "some of the boys were going to lose their jobs", and "it was going to be awful rough on some of the drivers". The

---

1. Teamsters Local Union 795, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. Indeed, this violation was conceded by the employer in the proceedings before the trial examiner.

3. The facts of the unlawful inducement as found by the trial examiner are these. Employee Fuller signed employee Latimer's name to a union authorization card. Latimer had given Fuller permission to do this, but apparently this permission was unknown to everyone else. Employee Van Stock (found to be a spokesman of management, although not a supervisor within the meaning of § 2(11) of the Act) then approached another employee, Mummey, told him that serious "trouble" could result from this "forgery" but that the trouble could be averted if the union were stopped. The next day Betts and Hilton, accompanied by company counsel, came to Mummey's house to discuss the "forgery". Mummey vol-

unteered to stop the union and was told he could do so by seeking return of the executed authorization cards. Betts stated that the company would "appreciate" it if Mummey tried to get the cards back.

Mummey and some of the other drivers went to Kansas City in mid-October to seek return of their authorization cards. They were unsuccessful. When they told Betts they were going to retain private counsel to pursue the matter, Betts told them to get a steak dinner at company expense.

The trial examiner concluded by stating that even if the one card had been forged the employer was not justified " * * * in stimulating Mummey to secure withdrawal of all the cards by threatening 'trouble' unless the Union drive was halted."

Such activity is a clear violation of 8(a) (1). See e. g. N.L.R.B. v. Howard-Cooper Corp., 9 Cir., 259 F.2d 558; N.L.R.B. v. Parma Water-Lifter Co., 9 Cir., 211 F.2d 258.

fourth alleged threat was made by Betts or Hilton to the effect that "there will be new faces in the spring". It is either admitted or not denied that these statements were made.

■■ The employer's contentions go to its liability for the utterances of Van Stock on the theory that if the employer did not violate the Act through his three statements, the remaining one statement by Betts or Hilton would be an isolated act not rising to the status of an 8(a) (1) violation, i. e., see J. S. Dillon and Sons Stores Co. v. N.L.R.B., 10 Cir., 338 F.2d 395. Following this tack, the company first asserts that Van Stock's statements were not threats but instead were mere expressions of opinion, and as such protected under the Act. See § 8(c). But, even if we assume, as did the trial examiner, that Van Stock qualified one or two of his statements by adding that what he said was based on prior experience with unions, nevertheless it is a reasonable inference that his utterances were intended to be threats. See N.L.R.B. v. McCatron, 9 Cir., 216 F.2d 212; N.L.R.B. v. Williams, 4 Cir., 195 F.2d 669. The drawing of such inferences is the peculiar province of the Board, i. e. see N.L.R.B. v. Bear Brands Roofing, supra.

The company argues, however, that even if the statements were threats, it is not responsible for them because Van Stock was found by the Board to be a non-supervisory employee with no power to hire and fire. The company also points to Van Stock's testimony to the effect that Betts reprimanded him for one such statement he made, and that Betts was ignorant of the fact that Van Stock continued to make such statements.

■ We considered the question of employer responsibility for employee acts in Furr's, Inc. v. N.L.R.B., 10 Cir., Feb. 20, 1967, 381 F.2d 562. To be sure, in that case the employees in question were supervisors within the meaning of § 2(11). But, supervisory status was not held to be conclusive of employer responsibility. Instead, the crucial inquiry was found to be whether the other employees had justifiable cause for believing that these supervisors were acting for and on behalf of management when they did the acts in question. We think this test is equally applicable to the actions of non-supervisory employees, a conclusion amply supported by case law. See N.L.R.B. v. Des Moines Foods, Inc., 8 Cir., 296 F.2d 285, and cases cited at 287; N.L.R.B. v. Solo Cup Co., 8 Cir., 237 F.2d 521; and see N.L.R.B. v. Champa Linen Service Co, 10 Cir., 324 F.2d 28. Following this test, the Board found that Van Stock occupied such a status with the company, different from other drivers, that the other employees could and did regard him as a management spokesman.

■ We find ample support in the record for the Board's finding. There was creditable testimony to the following effect: Van Stock had the title of "transport supervisor"; as such he reported to and received instructions from Hilton, and his job was to "get them [the drivers] to do their work properly"; the drivers brought to him problems with improper loading, routes, equipment, and illness (he was the relief driver); he attended one meeting of company supervisors and the discharge interviews for two employees; he was paid $14 per week more than the next highest paid driver. Van Stock's special status as a management spokesman is also indicated by his participation in other facets of the anti-union campaign. Thus, he testified that early in the union drive he reported to Hilton concerning employee activities and was told to report conversations concerning the union so that Hilton would "know how things were going, and what I could find out." There is testimony that he was present when Betts and Hilton interrogated drivers concerning union activities. And, Van Stock took an active part in the company effort to stimulate employees to leave the union, see footnote 3 supra. In view of all this evidence Betts' reprimand, if issued, could in no way operate to relieve the company of responsibility, especially since no effort was made to in-

form the employees that Van Stock's statements did not represent company policy, if indeed they did not. Cf. Furr's, Inc. v. N.L.R.B., supra, and cases cited.

The company next denies that it violated 8(a) (1) by granting a wage increase shortly after the union drive began, and retirement benefits a few days later on October 1. As to the wage increase, the company points out that it gave all 88 wholesale employees a raise, not just the transport drivers (although it does not deny that the increase given the drivers was greater than that given the other wholesale workers), and that this was the time of year when increases were normally given. With respect to the retirement plan it relies on evidence to the effect that a retirement system had been under company study as early as March, 1964; that about a week before the union drive started the company held a supervisory meeting at which the plan was discussed and the office manager directed to gather the information necessary to institute retirement benefits; that the manager was delayed by heavy fair business and for this reason the plan was not effectuated until October 1. The company thus argues that the wage and retirement benefits were unrelated to the union activities, i. e. that these " * * * well-timed increases [did not suggest] a fist inside the velvet glove." N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435.

But, the employer conveniently overlooks testimony by employee Fuller that Hilton gave him a list of the transport drivers who had signed union cards and asked him to find out if these men would "accept a $6 raise". Fuller did as directed, reported back, and the increase was given. (Fuller's testimony was corroborated by Hilton.) About a week later, Betts observed to Fuller: " * * * the boys have their retirement plan, have their raises * * * that is all I am going to do, that is it * * * As far as unions are concerned, I don't need the union to fire any of our boys * * * ". There is also testimonial evidence that

a few days before October 1 an employee told Betts that one thing he thought a union would accomplish was the acquisition of a retirement program. There is no evidence that the company definitely decided prior to September 15 to grant retirement benefits nor evidence that implementation of the plan was announced before October 1.

■ From this evidence, and in view of the other conduct in violation of 8(a) (1), it is entirely reasonable to conclude that the wage and retirement benefits were intended to hinder the transport drivers in their organizational efforts in violation of the Act. See Crown Tar & Chemical Works Co. v. N.L.R.B., 10 Cir., 365 F.2d 588, 590, and cases cited; Cf. J. S. Dillon and Sons Stores Co. v. N.L.R.B., supra.

■ The final issue raised on appeal concerns the Board's finding that employees Brown and Mummey were discriminatorily discharged in violation of § 8(a) (3) and (1) for engaging in union activities. It is established that union membership is no "shield against discharge", i. e. see Rocky Mountain Natural Gas Co. v. N.L.R.B., 10 Cir., 326 F.2d 949, 952, and that an employee may be discharged for any reason, good or bad, so long as union activity is not the basis of the discharge. Id. 952; N.L.R.B. v. Ace Comb Co., 8 Cir., 342 F.2d 841. Indeed, the statute commands in § 10(c) that " * * * No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause * * * ". It seems settled, however, that the Act may be violated if union discrimination is but a partial motive for the discharge. See N.L.R.B. v. Western Meat Packers, Inc., 368 F.2d 65; Local No. 152 v. N.L.R.B., 120 U.S.App.D.C. 25, 343 F.2d 307; N.L.R.B. v. Great Eastern Color Lithographic Corp., 2 Cir., 309 F.2d 352; N.L.R.B. v. Electric Steam Radiator Corp., 6 Cir., 321 F.2d 733; Cf. Farmbest, Inc. v. N.L.R.B., 8 Cir., 370 F.2d 1015.

Ascertaining an employer's motives frequently presents perplexing problems for the fact finder. The problem is no less perplexing for the reviewing court. The cases are legion, and to be properly juxtaposed each must be analyzed in terms of its own peculiar facts. We shall, therefore, not attempt a discussion and reconciliation of the recent cases from our own [4] or other [5] circuits; instead we shall proceed directly to review the evidence of discrimination, drawing upon the case law when helpful in the decision of our case.

 Rarely, if ever, does an employer admit that an employee has been discharged for participation in union activities. Discrimination must, therefore, usually be proved by circumstantial evidence, and properly so. See N.L.R.B. v. Western Bank and Office Supply Co., 10 Cir., 283 F.2d 603. Our case is no exception. It is established that both Mummey and Brown were active in the union organization drive, and that this participation was well known to the company. Both were good workers. There was testimony that at the time of the discharges (Mummey in early January and Brown in early February) the company was continuing to interrogate employees concerning union activities despite the union's withdrawal of its certification petition the preceding November. Both of these employees had been threatened with economic reprisals—Mummey was in the group of employees who were told by Van Stock that "it was going to be awfully rough on the drivers", and Brown had been told by Betts or Hilton that there would be "new faces in the spring". In these circumstances Judge Lewis' apt analysis in Rocky Mountain Natural Gas Co. v. N.L.R.B., supra, is apposite. The

discharge of qualified workers who are also active unionists " * * * is a circumstance of suspicion which may give rise to a justified inference of violative discrimination"; in such a case " * * * the issue must * * * be determined by the degree of significance to be given to [the employer's] explanation of the reason for the discharge * * * ". Id. 326 F.2d 952.

The employer asserts that Mummey, who had no history of insubordination, was discharged because of his "unsatisfactory attitude", which was expressed to company officials as a result of the following events. On the night of January 8–9 Mummey was short 30 loaves of French bread at his stop in Russell, Kansas. At his last stop he found the bread which, due to another employee's error, had been loaded in the front of his truck. He brought the bread back to Hutchison, and it was later delivered to Russell by another employee. It is uncontroverted that it was not a violation of company rules to bring the bread back to Hutchison. Two days later, after returning from an overnight trip, Mummey spoke with the sales supervisor concerning the 30 loaves of French bread. During the conversation, the supervisor stated that he "should have called [Mummey] to take the French bread to Russell", a 200 mile round trip. Mummey replied, "I told him that if the truck would have been loaded correctly, that the oversight and mistake shortage wouldn't have been made, and that I didn't feel that I should have taken it back. And that is what it had to be, I didn't think that much of my job to stay up all night and go do that the next day." Mummey repeated this statement later that day in a meeting with Hilton and was thereupon dis-

4. Duo-Bed Corp. v. N.L.R.B., 9 Cir., 337 F.2d 850; N.L.R.B. v. Western Meat Packers, supra; N.L.R.B. v. Bear Brands Roofing, Inc., supra; N.L.R.B. v. Allied Distributing Corp., 10 Cir., 297 F.2d 679; N.L.R.B. v. Central Oklahoma Milk Producers Ass'n, 10 Cir., 285 F.2d 495; N.L.R.B. v. Western Bank and Office Supply Co., supra; Rocky Mountain Natural Gas Co. v. N.L.R.B., supra.

5. Cf. N.L.R.B v. Superior Sales, 8 Cir., 366 F.2d 229; Shattuck Denn Mining Corp. (Iron King Branch) v. N.L.R.B., 9 Cir., 362 F.2d 466; N.L.R.B. v. Camco, Inc., 369 F.2d 125, with N.L.R.B. v. Monroe Auto Equipment Co., 8 Cir., 368 F. 2d 975; Farmbest, Inc. v. N.L.R.B., supra; Wm. H. Block v. N.L.R.B., 7 Cir., 367 F2d 38; N.L.R.B. v. Comfort, Inc., 8 Cir, 365 F.2d 867.

charged. There is evidence that sometime before the union drive the company dismissed an employee for displaying a "belligerent attitude".

The trial examiner discredited the company's contention that Mummey's expressed attitude was the reason for his discharge. After recognizing that an employer had a perfect right to dismiss for "unsatisfactory attitude", the examiner stated that nevertheless " * * * in determining whether the Company really discharged Mummey for that statement, it is fair to weigh all the facts, including not only the anti-union animus of the Company, but the seriousness of the offense, for if the offense be minor, it is reasonable to infer that the severity of the penalty had its source in some conduct beyond the offense." He noted, in effect, that the offense was minor, and that moreover the whole discussion was academic in that the bread had been delivered and at most Mummey was stating that he would refuse to make such trips in the future. The examiner concluded that "Surely an employer not searching for an excuse to fire Mummey would have waited until he actually did refuse to carry out such an order before firing him, particularly as Mummey had obeyed similar orders in the past."

■ It is thus apparent that the examiner was well aware of the controlling law, and that he comprehensively applied it to the facts. And, like the examiner, we are also unpersuaded by the reason proffered by the employer for the discharge. We conclude that the inference of discrimination in the discharge of Mummey is certainly a reasonable one in all the circumstances of the case and is supported by substantial evidence.

As to Brown's discharge, the company contends he was dismissed for using profanity. On the morning of February 5 Hilton had parked his car in such a way as to partially block the space where Brown parked his transport. Brown, after returning from an overnight trip, was engaged in parking his truck with the aid of direction signals given by a fellow employee. While backing his transport on the second attempt he observed that "if a guy should hit that buckskin son-of-a-bitch [the car] he'd sure as hell would get fired". Hilton, at that exact moment, emerged from his office and overheard the remark. His immediate reaction was to fire Brown. Hilton testified that he realized the remark was directed at the car and not at him, but that nevertheless "if you are in the service you salute the uniform, not the man in it"; that although Brown was a good worker he did not like him; and that he acted rashly and in anger when he fired Brown. He also testified that Brown on two occasions had damaged company property, that he had decided to discharge Brown on the second occasion but was stopped by Betts "because of the union thing going on, they didn't want to stir up any trouble", and that he thereupon warned Brown to be more careful. It was uncontradicted that prior to the union drive, the company discharged an employee for directing profanity at company officials. However, the trial examiner attached no significance to this fact since it was also uncontradicted that both Brown and another employee frequently used profanity around the plant.

The examiner stated that his reasoning in Mummey's case was equally applicable in Brown's. He concluded that on the whole record, " * * * it is a fair inference that the employee's union activity contributed to the discharge, and that the trivial [profanity] episode would have provoked a lesser response or none at all, but for the union activity."

■ Brown's case is closer than Mummey's, for it is uncontradicted that Hilton acted rashly out of personal dislike. Indeed, the trial examiner does not seem to have discredited Hilton's testimony as to his reason for the discharge, but instead found that Brown's union activity "contributed" to his discharge. As we have noted, such a finding, if supported by substantial evidence, is a finding of an unlawful act. In view of the whole record, and especially in view of the fact that either Betts or Hilton threatened Brown that as a result of the union

drive he could "expect new faces in the spring", we are satisfied that the Board's finding is based on substantial evidence. Otherwise stated, we think it a reasonable inference that at least in part the company was making good on its threat.

The order is enforced.