NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The DAYTON TIRE & RUBBER COM-
PANY, a division of the Firestone Tire
& Rubber Company, Respondent.

Nos. 74–1019, 74–1020.

United States Court of Appeals,
Tenth Circuit.

Argued Aug. 20, 1974.

Decided Sept. 23, 1974.

William H. DuRoss, III, Atty., N. L.
R. B., (Peter G. Nash, Gen. Counsel,
John S. Irving, Deputy Gen. Counsel,
Patrick Hardin, Associate Gen. Counsel,
Elliott Moore, Deputy Associate Gen.
Counsel, and William R. Stewart, Atty.,
N. L. R. B., on the brief), for petitioner.

Edward E. Soule, Oklahoma City, Okl.
(Walter B. Connolly, Jr., Akron, Ohio,
The Firestone Tire & Rubber Company,

and Of Counsel: Lytle, Soule & Emery, Oklahoma City, Okl., on the brief), for respondent.

Before HILL and DOYLE, Circuit Judges, and TALBOT SMITH, * District Judge.

WILLIAM E. DOYLE, Circuit Judge.

The above two cases are before us on applications of the National Labor Relations Board (N.L.R.B.) seeking enforcement of orders issued by it to the respondent pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. In each instance the Dayton Tire & Rubber Company, a division of Firestone Tire & Rubber Company, is the respondent. The alleged unfair labor practices occurred at the plant of respondent located in Oklahoma City, Oklahoma.

### Case No. 74–1019

Starting in March 1971, the Union began a campaign to organize respondent's employees. One Paul Grammont was one of the early Union advocates. Evidence showed that he wore a Union T-shirt at work, signed a Union authorization card and solicited other employees to sign Union authorization cards. He testified that at the end of July 1971, his supervisor, Bratcher, approached him and asked him how his business was. When Grammont asked whether he was referring to the Union, Bratcher said that he was and added that "You can't organize the plant with one or two guys coming to a union meeting", and when Grammont asked how he knew this he replied that he had ways of knowing. Another time Bratcher stated to him that he did not have to worry about the Union guys. "All I have to do is go down to the belt and start picking on your tires."

On January 22, 1972, the warehouse supervisor, one Williams, called his employees together and told them how proud he was of their work performance

the preceding night and although it was none of his business he was going to take a poll to find out if the men wanted the Union. He requested each employee to place an unsigned note on his desk stating "Yes" or "No". The employees, however, ignored this, and when Williams approached the men individually and asked them how they were going to vote in the Board election scheduled for April 16, 1972, they refused to reveal this information.

In March 1972, one Hembree, a supervisor, approached an employee, Randy Ferguson, and asked him what he thought about the Union and whether he thought it would help the company if the Union was successful in organizing the plant. Again, on April 1, Hembree asked him what he thought of the Union, and Ferguson replied that he had had two prior experiences with unions and they provided a pretty good deal.

A hearing was held on June 5–8, 1972, but before the decision was entered, the Administrative Law Judge reopened the case and held the second hearing involving additional violations. Employees Allred, Bert Verel and Paul Greenwood testified on behalf of the General Counsel during the June 6, 1973 hearing.

The employee Allred, when he returned to work on June 8, was given a memorandum to report to personnel on absenteeism. The memorandum regarding Allred's absence stated that it was personal and concluded that Allred had been in the past counseled about absenteeism.

Verel worked on June 8 without any incident. Both Allred and Verel were given to understand that even though the absence to testify at the Board meeting was valid, nevertheless the company disapproved of it. Verel was told that if he did not straighten out he would be either discharged or suspended. This, notwithstanding that Verel had explained that he had a great deal of family illness. The same attitude was taken

---

* Honorable Talbot Smith, United States District Judge, Ann Arbor, Michigan, sitting by designation.

toward employee Paul Greenwood. As a result of his testifying, he was subjected to criticism or reprimand. Subsequently, Greenwood called in to state that he was not going to be there on June 29 due to the fact that his wife had left him. He was told by his supervisor that he could not be excused because of his poor record. The supervisor said he would allow him two hours.

Employee Harrington was discharged for allegedly stealing. What he had done was to turn in time cards which were erroneous in that they purported to reflect work performed on whitewall tires instead of blackwall tires.

Chambers was shown to have been very active in union organization, notwithstanding that his work was uniformly rated good and he received commendations. He was suspended for one day and given six months probation because of absenteeism. He was told that any unexcused absence would subject him to possible discharge. But on July 7 and 8 Chambers arrived for work four or five minutes late. On his time card he indicated that he had worked eight hours. The upshot of this was that he was fired.

The Board, on the basis of the facts recited above, found that the company had violated § 8(a)(1) of the Act by coercively interrogating certain employees about their voting intentions in a Board election and by creating the impression among the employees that it had their pro-union activities under surveillance. The Board also found that the company violated § 8(a)(3) and (1) by preparing absentee reports on two employees, showing them the reports and making them a part of the employees' personnel files.

The Board also found that there was a violation of § 8(a)(4)(3) and (1) as a result of the discharge of Chris Chambers because of his pro-union activities. The Board also found violations growing out of the discharge of Paul Greenwood and growing out of the assignment of Paul Grammont to an undesirable work station. The Board found that the sanctions imposed were the result of the testifying by these employees on behalf of the General Counsel at a Board hearing. It was also found that the company had violated § 8(a)(4) and (1) by their discussions with employees Allred and Verel about absences relating to testimony before the Board. The Board also found, Chairman Miller dissenting, that the company violated § 8(a)(3) and (1) by discharging employee Harrington because of his pro-union activities.

The Board ordered the company to cease and desist from the practices that it found and also enjoined the respondent from restraining or coercing the employees in the performance of their § 7 rights. The Board's order also required the respondent to offer jobs to employees Chris Chambers, Paul Greenwood and Patrick Harrington, giving full and immediate reinstatement without prejudice to their seniority or their rights and to make them whole for any loss of earnings suffered as a result of the discrimination. The Board also required the company to offer employee Paul Grammont assignment to a tire-building machine No. A–7 or to an equivalent one and to make him whole for his loss of earnings. The Board also ordered the respondent to expunge the absentee reports of employees Allred and Verel.

The respondent company seeks to justify all of the actions taken by it on the basis that the several employees were not discharged because of union activity or testifying at the Board meeting or that in the case of Grammont, Allred and Verel the respondent discriminated against them because of their union activities. However, the Board found in each instance that the union activities were at least part of the reason for the discharge.

It is impossible for us to say that these findings and orders were not supported by substantial evidence on the record as a whole. In most instances the company would have us draw different inferences than were drawn by the Board. This is not to say, however, that

the inferences which were adopted were not fully supported by the record. In the case of Harrington and Chambers, for example, the Board found that the company's asserted explanation was pretextual and that the real reason for the discharge of these employees, who were shown to have been experienced, was their pro-union activity. But the Board also found that the union activities were the real reason and that the company's conduct was unlawful. The evidence on behalf of the Board, generally speaking, tended to establish that the work records of the employees in question were good; that the reasons for discharge were generally frivolous; that this weighed in relationship to their substantial activities on behalf of the union added up to discharges or other sanctions being attributable to union activities and thus being in violation of the statutory provisions heretofore cited.

In some instances the evidence and findings seek to establish that the company went to extraordinary lengths to accomplish the firings or other sanctions.

It was for the Board to interpret the basic facts and to draw the inferences which it regarded to be logical from these facts. Inasmuch as these findings are supported by substantial evidence on the record as a whole, we are constrained to uphold the Board's findings.

### Case No. 74-1020

This case is also before the court on the application of the N.L.R.B. for enforcement of the Act pursuant to § 10(e), 29 U.S.C. § 151 et seq. The order which it requests us to enforce was issued on November 28, 1973. The respondent is the same as in 74-1019. The persons who are the object of the alleged unlawful discrimination of the company were Thomas Rose and Paul Grammont. The former was discharged on March 22, a few days following his being observed distributing union authorization cards to his co-workers. The

Board asserted that the discharge was for violating the company rules against solicitation, but the Board found that the no solicitation rule was discriminatorily applied; that the actual basis for the discharge was Rose's active union support which was determined to be a violation of § 8(a)(3) and (1) of the Act.

As to the employee Grammont, the company officials seized Union authorization cards from him and made a statement which the Board considered established that the company was engaged in surveillance of union activity or conduct tending to interfere with employee organizing rights contrary to § 8(a)(1) of the Act.

The Board's position is that, first, the existence of a valid reason for discharging an employee is not controlling where the action is also motivated by the employee's union activity. They cite S. A. Healy Co. v. N.L.R.B., 435 F.2d 314 (10th Cir. 1970) and Betts Baking Co., Inc. v. N.L.R.B., 380 F.2d 199 (10th Cir. 1967).

Second, the Board says that it is unlawful to prohibit union activities where it is shown to have liberally allowed or permitted *other* solicitations in the plant. Such a discharge resulting from a discriminatory application of a no solicitation rule, it is argued, is a violation of § 8(a)(3) and (1) of the Act.

The evidence in the case of Paul Grammont is here summarized to the extent necessary to show the nature of the issues. During the time in question he was the Union organizing committee chairman for the plant's day shift. As such, signed authorization cards were handled through him. He received 52 or 53 signed cards which either he or others had initially distributed. In addition to attending the Union meetings, he distributed Union handbills at the plant's front gate.

The present problem had its inception in Grammont's removing from his pockets all of his personal property including watch, lighter, keys, cigarettes, billfold

and a quantity of Union cards (when he reported for work). These were placed on top of his machine. The foreman made an issue out of the fact that he had the Union authorization cards among his property and told him he was not to leave the cards on his machine or they would be confiscated. Grammont took issue with the foreman, stating that if he was going to confiscate his cards he ought to confiscate the rest of his property as well.

Two days later, the foreman noticed that the cards were still in evidence and when Grammont again argued with him he reported Grammont to the Personnel Manager, who interviewed him in his office, calling his attention to the fact that thievery was a basis for firing an employee, and he added that if employees were to take these cards from Grammont's work space these employees would subject themselves to being fired.

The incident pertaining to employee Rose occurred on March 22, 1973. Rose operated a forklift, which supplied the tire machine operators with the plies, whitewalls, shapers, beads and treads. Rose attended the Union's initial campaign meeting in February and obtained an authorization card. As a member of the organizing committee he passed out Union authorization cards during lunch and other break periods. On about March 20 during a break, Rose was asked by employees for cards. While Rose was moving back to the break area in order to let the employees sign the cards, the foreman and supervisor were observing what was happening.

The other Rose incident which was the subject of company complaint involved the handing of 20 Union cards by Rose to an employee named Hoover. This incident was observed by the supervisor who asked Rose to deliver the cards. This he did. Rose was discharged as a result of this. Hoover, the man who received the cards, was not fired. The basis for the firing of Rose was the no solicitation rule which renders an employee subject to discharge for handing out literature and other materials unrelated to work. The evidence showed that no other employee had ever previously been discharged for this.

Based upon the foregoing, the Board found, as did the Administrative Law Judge, that Rose was discharged so as to discourage union activities and not for the purpose of promoting production and plant discipline. It further found that the action against Grammont was coercive in that it gave the impression that union activities were under surveillance.

■■ The relevant statutory provision is § 8(a)(1) of the National Labor Relations Act which declares that it is an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights guaranteed by § 7 of the Act. It is not easy to determine the bona fides of an employer in its application of a rule which is ostensibly designed to prevent solicitation during working hours in the interest of promoting work production. The question is whether he is actually using the rule in order to suppress union activity. One criterion which exposes the presence of the union suppression motive is the application of the rule in an exaggerated, overly strict manner. That element might well support a conclusion of fact such as the Board found in this case. In other words, the presumption which attaches to the validity of these solicitation restrictions loses much of its meaning where the incident is a trifling or technical one and is nevertheless applied in a vigorous manner. The testimony and the record as a whole support the Board's finding that the no solicitation rule was applied discriminatorily, particularly in view of the fact that solicitations had been tolerated in various other instances. These efforts used much more time than was shown to have been used in handing cards to Hoover. Also, football betting pools were conducted on the premises during working hours. Accordingly, the Board was within its rights in holding that the rule was applied in a discriminatory fashion.

■ There was ample evidence to support the Board's finding that employee Grammont was coerced. Based

on what appears, the Board was justified in treating this as a frivolous incident.

\*  \*  \*  \*  \*  \*

Respondent and the Board as well would have us retry all of these controversies and reevaluate as well as weigh the conflicting evidence. Such a detailed dissective process is impossible. We are ill equipped to reconsider all of the testimony in detail and assign correct significance to the various activities of the respondent and the employees. Thus, we must rely on the deductive expertise of the Law Judge and the Board members.

Finally, to repeatedly maintain that particular inferences drawn from basic facts are out of harmony with other decidions of the Board and of reviewing courts in other circuits is also untenable because each of these cases has its own peculiar facts.

The findings of the Board in both 74–1019 and 74–1020 are supported by substantial evidence on the record as a whole. Accordingly, it is directed that these orders of the Board be enforced.