**CAIN'S COFFEE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 9974.**

United States Court of Appeals Tenth Circuit.

Dec. 24, 1968.

John W. Swinford and Jack R. Durland, Jr., of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for petitioner.

Leon Kestenbaum, Atty., National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Paul J. Spielberg, Atty., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before LEWIS, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

Cain's Coffee Company seeks review of that portion of a decision and order of the National Labor Relations Board which requires the petitioner to take remedial action to correct violations of sections 8(a) (3) and 8(a) (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. The Board cross-petitions for enforcement of its order. It is the contention of the petitioner that the record does not support the Board's finding, contrary to the recommendations of the trial examiner, that Cain's discharged an employee as a result of his engaging in protected union activity. An additional finding of both the trial examiner and the Board that petitioner violated section 8(a) (1) of the Act by coercively interrogating its employees concerning their union activity prior to a representation election is not here challenged.

Petitioner is engaged in the marketing of coffee, tea, spices and similar products to grocery stores and restaurants. To accomplish the sale and delivery of these products, salesmen are employed to operate small trucks over assigned routes within the five state area serviced by the company. The present controversy stems from the discharge of one of these salesmen, Gordon Griffin, who was one of thirty-two such salesmen assigned to the Oklahoma City area.

On Saturday, June 9, 1966, some of the Oklahoma City salesmen who had attended the company's regularly scheduled sales meeting adjourned to a local cafeteria for the purpose of preparing certain grievances to be presented to their employer. Griffin, having been appointed chairman and spokesman for the group, was approached while on his sales route the following Monday by Harley Hutsell, the company's general sales manager, who inquired as to the significance of the "secret meeting." Hutsell was informed of the nature of the meeting and thereafter suggested that the coming Saturday's sales meeting be eliminated and the time devoted to a discussion of grievances. At that ensuing meeting the employee proposals were fully discussed. Some thirty days later, Hutsell again approached Griffin concerning another supposed "secret meeting." Griffin denied that any such meeting had been held and inquired as to the status of the employer's consideration of the previously submitted grievances. After being advised that little progress had been made, Griffin called upon the Teamsters Union and discussed the employees' difficulties with a local union official. Before the discussion concluded, Griffin signed a union authorization card.

Soon thereafter, Griffin and two other employees visited Hutsell's office to inquire as to the employer's intended disposition of the employee proposals. Hutsell informed them that he had discussed the matter with the company's president, Jack Durland, and that due to its financial position the company was precluded from taking any immediate action. The employer's response was relayed to the other salesmen, many of whom then joined the union and filed an election petition with the Board.

On September 7, 1966, some three weeks prior to the scheduled election, Durland summoned each salesman individually to his office for the purpose of discussing the election and to ascertain the employees' thoughts as to the desirability of union representation. Durland indicated that he could not "understand why a professional man earning $1,000 a month would want to turn his business over to somebody else to represent him."[1] During the interview with Griffin, Durland inquired as to the progress being made in disposing of a motel that Griffin and his wife had previously purchased and which the company had directed him to dispose of in order to conform to an unwritten company policy forbidding "moonlighting." Griffin replied that he was in the process of disposing of the motel and would keep Durland advised. At the subsequent Board election, held on September 30, 1966, the union was defeated by a vote of twelve to twenty-two.

A few weeks later, on October 21, 1966, Durland sent Griffin a letter in which he restated the company's opposition to employees engaging in extraneous business activity. Griffin was requested to advise Durland in writing as to the steps being undertaken to rectify the situation. After returning from an intervening vacation. Griffin responded with a detailed explanation of his attempts to dispose of the motel. He indicated that he understood the company's concern but would not allow the operation of the motel to interfere with his sales performance and would make every effort to eliminate the seven percent loss in sales that he had incurred during the year.

---

1. The employee interrogation involved other statements by the company's president but because the Board's determination that this employer conduct violated section 8(a)(1) has not been challenged further elaboration is unnecessary.

Griffin further stated that although his initial $70,000 investment in the motel had been augmented by an additional $30,000 in improvements, he had been unable to find a buyer even at the reduced asking price of $95,000. On November 12, 1966, Hutsell and George Patrick, Griffin's immediate supervisor, called Griffin into Hutsell's office where Griffin was informed that he was being dismissed because his sales had drastically declined, some of his key customers were dissatisfied with him, and his continued operation of the motel was unacceptable.

On the basis of the foregoing facts, the trial examiner found that Cain's had violated section 8(a) (1) by coercively interrogating its employees with regard to their union activity. The trial examiner further concluded that the company had not violated section 8(a) (3) of the Act. He indicated that Griffin's declining sales record, his interest in the motel, and his difficulties with the customers, merged to provide good and adequate grounds for a discharge "for cause." There was felt to be no credible or persuasive evidence, apart from the timing of the discharge, that tended to link the dismissal with Griffin's involvement in protected union activity. The Board disagreed, concluding instead that the company's opposition to union organization as demonstrated by the unlawful interrogation, its knowledge of Griffin's leadership in the concerted activity, and the timing of the dismissal, were sufficient to sustain a finding of discriminatory discharge.

■■ The question presented is the familiar one of determining whether there is substantial evidence to support the Board's conclusion that the discharge was prompted by the employee's participation in union activity. It is elementary that union membership is no shield against discharge. Employees may be dismissed for any reason, or no reason, and as long as union activity is not the basis for the discharge an order for reinstatement will not issue.[2] Hence, the evidence must be analyzed to determine whether union discrimination was the motive for the discharge, i. e., the employer would not have acted against the employee were it not for his union activities. In thus examining the record, this court is bound to uphold the Board's ultimate findings and conclusions unless it can be said that they are clearly erroneous. Nevertheless, it would be an abdication of our judicial function if we were to allow the Board to rely on mere suspicion and thus fail to confine the Board "within reasonable grounds."[3] Viewed in this context, we cannot say that the record substantially supports the Board's rejection of its examiner's findings that the discharge was not improperly motivated.

■ The Board by its own admission relies primarily upon the timing of the discharge to sustain the inference of discrimination. However, even though the dismissal of employees who are active unionists " 'is a circumstance of suspicion which may give rise to a justified inference of violative discrimination' * * * 'the issue * * * must * * * be determined by the degree of significance to be given to [the employer's] explanation of the reason for the discharge.' "[4] Accordingly, when the

2. Betts Baking Co. v. N.L.R.B., 380 F.2d 199, 203 (10th Cir. 1967); Rocky Mtn. Natural Gas Co. v. N.L.R.B., 326 F.2d 949, 952 (10th Cir. 1964). "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." Section 10(c), 29 U.S.C. § 160(c). See generally, Annot., 83 A.L.R.2d 532 (1962).

3. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Pioneer Drilling Co. v. N.L.R.B., 391 F.2d 961 (10th Cir. 1968); N.L.R.B. v. Western Bank and Office Supply Co., 283 F.2d 603 (10th Cir. 1960).

4. American Sanitary Products Co. v. N.L.R.B., 382 F.2d 53, 56 (10th Cir. 1967) citing Betts Baking Co., Inc. v. N.L.R.B., 380 F.2d 199, 204 (10th Cir. 1967) quoting Rocky Mtn. Natural Gas Co. v. N.L.R.B., 326 F.2d 949, 952 (10th Cir. 1964).

employer has come forward with evidence to establish a legitimate motive for the dismissal, it is incumbent upon the General Counsel to then explicitly demonstrate that an improper motivation contributed to the discharge.[5] Failing this, the presence of legitimate business reasons underlying the dismissal is sufficient to preclude a finding of discrimination.

Here the employer introduced evidence that established that when Griffin purchased the motel [6] his sales began a drastic decline until at the time of his dismissal he had suffered a twenty-seven percent loss in coffee sales—coffee accounted for seventy percent of his total sales. Over the same three-year period his commission based salary decreased thirteen percent. The Board in an attempt to dismiss this evidence as being relatively unpersuasive, pointed to the fact that other salesmen incurred losses, and that on an annual comparison, Griffin ranked third in sales when he was discharged in 1966. This vain attempt to degrade the significance of Griffin's sales record overlooks the fact, as found by the examiner, that the twenty-seven percent decrease was by far the worst suffered by any of the salesmen in the area.[7] Furthermore, there were at least three specific instances during the relevant three-year period in which Griffin antagonized his customers. One of these incidents involved a running feud with the manager of a large discount store whose purchases constituted thirty-five percent of Griffin's sales. It was this conflict that led Griffin's supervisors to visit that customer and having learned that Griffin continually refused to comply with reasonable requests as to delivery time and shelf space, prompted his discharge the next day.[8] The foregoing, when coupled with Griffin's refusal to divest himself of the motel after having been asked to do so more than a year prior to his dismissal, presented more than adequate business justification for the discharge. As stated by the trial examiner: "[I]t is difficult for any reasonable person to understand, why in the light of the evidence adduced by Respondent [Cain's], any employer would continue the employment of Griffin."

■■ In view of the demonstration of a legitimate business justification for the discharge and in the absence of any specific showing of anti-union motivation, we conclude that the Board's finding was not based on substantial evidence. In circumstances such as these, where there is insubstantial support for the Board's inference that anti-union animus motivated the dismissal, we must accord respect for a contrary inference especially where, as here, such a contrary inference was also found by the trial examiner.[9]

---

5. N.L.R.B. v. Neuhoff Bros. Packers, Inc., 398 F.2d 640, 647 (5th Cir. 1968) citing N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); N.L.R.B. v. Billen Shoe Co., Inc., 397 F.2d 801 (1st Cir. 1968); N.L.R.B. v. Tepper, 297 F.2d 280 (10th Cir. 1961).

6. The employer contends, and the trial examiner found, that the burden of operating the motel and the preoccupation with recouping an unwise investment "would inevitably create a tension and concern that interfered with [Griffin's] full attention to his job with Respondent [Cain's]." This explains the relevance of the employee's sales performance data beginning with the date of the motel acquisition.

7. Because of the divergence in the desirability of the various sales routes, the crucial inquiry requires a comparison of each salesman's present and past performance rather than a comparison of his total sales with the total sales of other salesmen with different territories.

8. This particular customer difficulty had been the subject of previous discussion between Griffin and his supervisors. Thus, this was not a case in which an employee was summarily discharged without an opportunity to present his views or to rectify the underlying situation.

9. N.L.R.B. v. Neuhoff Bros. Packers, Inc., 398 F.2d 640 (5th Cir. 1968); N.L.R.B. v. Midwestern Mfg. Co., 388 F.2d 251 (10th Cir. 1968); Rocky Mtn. Natural Gas Co. v. N.L.R.B., 326 F.2d 949 (10th Cir. 1964).

The order of the Board to the extent that it relates to the employer's coercive interrogation in violation of section 8(a) (1) of the Act will be enforced; in all other respects the petition of the Board for the enforcement of its order is denied.