**M. S. P. INDUSTRIES, INC., d/b/a the Larimer Press, Petitioner,**

**and**

**Graphic Arts International Union, Local No. 276, AFL–CIO, Cross-Petitioner, and Intervenor,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 76–1100.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 18, 1976.

Decided Dec. 23, 1977.

---

168

James E. Hautzinger, Denver, Colo. (Charles W. Newcom of Dawson, Nagel, Sherman & Howard, Denver, Colo., on the brief), for petitioner.

Andrew F. Tranovich, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on the brief), for respondent.

Peggy A. Hillman, Chicago, Ill. (Irving M. King, and Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., of counsel, on the brief), for cross-petitioner and intervenor.

Before SETH, Chief Judge, HOLLOWAY, Circuit Judge, and CHILSON, District Judge.*

---

* The Honorable Hatfield Chilson of the District Court of Colorado, sitting by designation.

HOLLOWAY, Circuit Judge.

Petitioner M.S.P. Industries, Inc. (MSP), seeks review and modification of an order of the National Labor Relations Board, reported at 222 NLRB No. 29, which found MSP had committed unfair labor practices within the meaning of §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3) (1970) (interfering with, restraining or coercing employees in the exercise of rights guaranteed by § 7 of the Act; discrimination in regard to hire, tenure or any term or condition of employment to encourage or discourage union membership). The Board ordered MSP to offer reinstatement to two discharged employees and awarded those employees, as well as three others, back pay. It also ordered MSP to cease and desist from the unlawful practices and to post the usual notices.

Graphic Arts International Union, Local No. 276, AFL–CIO (the Union), intervened with respect to MSP's petition and also cross-petitioned for review of that part of the Board's decision which declined to issue an order requiring MSP to bargain with the Union. The Board filed a cross-application for enforcement of its order pursuant to § 10(e) of the Act, 29 U.S.C. § 160(e) (1970).

## I

### The Factual Background

MSP, a Colorado corporation, maintains its place of business in Denver, Colorado, where it is engaged in general commercial printing as "The Larimer Press." MSP's highest managerial official is Ray Scott who operates as an advisor to the Board of Directors, but has no official title. (R. 25). Roger Johnson, the general manager, reports directly to Scott. Benjamin Ewing is the plant superintendent. It is conceded that all these persons were supervisors within the meaning of Section 2(11) of the Act, 29 U.S.C. § 152(11) (1970).

MSP's production operations are organized into departments. Copy delivered by a customer is processed into a "camera-ready" form in the Art Department. From the Art Department work proceeds to the Preparatory Department which has three basic functions: first, negatives are produced by the camera; second, the negatives are "stripped" into proper position on a mask; third, the negatives are used in the preparation of plates for use on the presses. These plates are then taken to the Press Department where they are put on one of the company's five presses to produce the desired numbers of the printed product. Printed materials are then sent to the Bindery and Delivery Department where production is completed and the finished product delivered to the customer.

The facts stated above are undisputed. In our discussion which follows some of the facts are in sharp dispute. We state them as found by the administrative law judge and the Board or as indicated by some record evidence tending to support the findings. We note the major conflicts in the evidence.

The Union filed a representation petition on September 17, 1974, and on October 15, 1974, the parties entered into a Stipulation for Certification upon Consent Election, with the election scheduled for November 15, 1974. Thereafter, MSP held a series of preelection meetings with its employees during which Scott or Johnson told the employees that there had never been a layoff or a reduction in hours of work at MSP, even when production work was not available.[1] On November 7, a week before the election, Scott sent a letter to the company's employees in which he re-emphasized MSP's no-layoff policy (R. 40–41):

> Your work at the Larimer Press is steady. There has NEVER been a layoff in the history of the Company—over 7 years! Ask any member of the Union whether they have been kept on the payroll full time. When we have been short of work in the plant, rather than lay off, pressmen have worked in the bindery,

---

1. The "Employees' Handbook", which is distributed to all employees, states in pertinent part: "It should be noted that no one has been laid off in the history of the Company for lack of work". (R. 1639, G.C.Ex. 3 at 11).

employees from all departments have been given fill work—sometimes painting, etc., so they would receive a full week's pay at no reduction in their regular rate of pay! *The union will not permit this!*

(R. 1693, G.C.Ex. 24) (Emphasis in original). Scott reaffirmed this no-layoff policy in various discussions with individual employees prior to the election. (R. 110–11, 562–63).

The election was held at the company between 4:00 and 5:00 p. m. on November 15. There were 15 votes in favor of the Union and 6 against, with 8 ballots challenged.[2] (R. 16–17). Shortly after the election was over and the results announced, at about 5:15 or 5:30 p. m. the same day, Scott called a meeting of the company's management and decided[3] to lay off some employees on Monday, November 18. (R. 1008, 1037).

On Monday morning, the first regular working day after the election, Scott, accompanied by Johnson and Ewing, ordered each employee arriving at work to proceed directly to the employee's work station. (R. 302, 530, 565).

Soon afterwards, Scott, Johnson and Ewing went to each work station where Scott, using a document prepared by Johnson after the election, told each employee that: (1) they would not be permitted to leave their work stations, except in connection with their duties; (2) they were not to engage in personal conversation among themselves unrelated to their work; (3) they would be required to eat their lunches in the company lunchroom; (4) the lunch period would thereafter be staggered; (5) they would be required to punch out on completing the last job of the day and call in each day to ascertain whether there would be work for them the following day; and (6) the company was discontinuing its policy of providing free coffee for employees.[4] Scott also said that violation of any of these rules would subject the employee to dismissal. After this announcement Scott and Ewing placed Gonzalo Botello, John Filben, Henry Erlacher, Rafael Gonzalez and Rodney Olguin on an intermittent layoff status, stating that they would be notified or should call in to find out when work was available.

Botello, a stripper in the Preparatory Department, was informed by Ewing that he was being "temporarily laid off." (R. 386). Since Botello did not have a telephone at this time, Ewing instructed him to call in each day to see whether there was work for him. Botello testified that in a conversation with Scott later in the day, Botello was told: ". . . you brought this upon yourself." (R. 387); that when Botello asked how he had done this, Scott responded: "You voted for the Union." (R. 387); that Botello denied voting for the Union but Scott stated that he didn't believe him. (R. 387). Scott contradicted this testimony.[5] Botello remained out of work until

---

**2.** Since the challenged ballots could not affect the outcome of the election, the challenges were not resolved. Thereafter, the company filed timely objections to conduct affecting the results of the election. The Regional Director, after conducting an investigation, issued his report which recommended that the objections be overruled. (R. 97–98). The company filed exceptions to the report. These objections were overruled when the Board issued its Decision and Certification of Representative, adopting the Regional Director's findings and recommendations, and certifying the Union as the exclusive representative of MSP's employees. (R. 2294).

**3.** The actual decision to lay off and the selection of the affected employees appears to have been made on November 15, though it had

apparently been decided earlier in the week that if additional work was not received, "there would have to be some redistribution in the work force." (R. 1005–07).

**4.** The rules on leaving work stations and excessive conversation were existing company policy but the company's attitude toward enforcement of this policy had previously been one of "permissiveness." (R. 2296). The rules on the lunch period and lunch room seem to fall in the same category although they had not previously been the subject of written company policy. (R. 2297–98).

**5.** In Scott's version of the conversation, it was Botello who brought up the subject of the election. (R. 2310). The administrative law judge apparently accepted Botello's testimony. (R. 2323).

November 21. He worked 16 hours in the week ending November 29 but was permanently laid off on December 2. (R. 388). On February 7, 1975, Johnson called Botello to offer him work but he declined the offer. (R. 389–90).

Filben, the company's only platemaker, was told to confine his work exclusively to platemaking, even though normally he also performed other tasks. He was also told to punch out when there was no such work to be done. (R. 114–15). Filben continued working part-time from November 18 to December 2, when Ewing notified him that MSP had no further need for a full-time platemaker and that his job was being eliminated. (R. 118–19).

Erlacher, MSP's only cameraman, was escorted by Scott to his work station when he reported for work and was ordered not to leave the work area and to refrain from conversations with other employees on pain of discharge. (R. 242–43). About an hour and a half later, Ewing ordered Erlacher to clock out and told him to call the plant every evening thereafter to ascertain whether there would be work for him the following day. Between November 18, 1974 and late February, 1975, Erlacher worked intermittently for the company. (R. 1652, G.C.Ex. 10). Since February 18, 1975, by arrangement with Johnson, Erlacher has not been required to call in on a daily basis and has been working at least forty hours a week. (R. 261).

When Gonzalez, a stripper, reported for work on the evening shift on November 18, Ewing told him that the night shift had been eliminated and that he should return to work the next day on the day shift. (R. 420–21). Meanwhile, another stripper who had previously tendered his resignation changed his mind. When Gonzalez reported for work on November 19 as ordered, Ewing informed him that there was no work for him since the other stripper was not leaving. (R. 421). Ewing did suggest that he call in each evening to inquire whether work would be available for him the following day. Gonzalez complied with this request but it was not until the first week of February, 1975, that Johnson told him that there was work available. (R. 424–26).

During the morning of November 18, Olguin, a pressman, told Ewing that the announcement by Scott was "all wrong". A few minutes later, Scott approached Olguin and asked him what was wrong with the working conditions and asked Olguin: "why did they vote the union in?". (R. 305–06). Olguin insisted that the changes in the working conditions were wrong and suggested that the Union won the election "maybe because the people wanted more money." (R. 305–06). Olguin testified that Scott then cited some examples of the company's wage levels and told Olguin: "Do you know that your wages aren't going up—that they're going down?" (R. 306); that when Olguin asked Scott if that was a threat, Scott replied: "No, but your wages aren't going up—they're going down" (R. 306); and that Scott then asked Olguin: "Do you think I'll negotiate with the Union?" (R. 306); and that when Olguin replied: "Probably not," Scott said: "Right." (R. 306). Scott denied these statements.[6]

On December 3 Ewing notified Olguin that he was being laid off for lack of work and that the company intended to use other personnel to operate his press. (R. 310). He worked approximately 15 hours a week in December, somewhat less in January, 1975, not at all from January 25 to February 22, 1975, and intermittently from that time to the date of the hearing. (R. 1675–78; G.C.Ex. 17).

All of these laid off employees[7] had attended the company's preelection meetings

6. As noted, contradictory testimony was introduced by MSP, but Olguin's version as stated here was essentially credited by the administrative law judge.

7. Filben, Erlacher, Botello and Gonzalez worked in the Preparatory Department while Olguin worked in the Production Department.

They were not the only employees to be laid off.

The sales staff was reduced from six to five around November 18 and to three at the date of the hearing. (R. 746–47). However, the staff had just been increased from three to six in the spring or summer of 1974. (R. 674). The Art

and Filben, Erlacher and Olguin had spoken out at the meetings. Further, in a letter from the Union to all employees dated November 20, 1974, Filben, Erlacher and Olguin were named along with three other employees as members of the Union Committee which was to represent the Union in its negotiations with MSP. Scott admitted seeing a copy of this letter on his desk, but he testified that it first came to his attention on December 3 or 4, after the layoffs of Filben and Olguin. (R. 783).[8]

On the basis of such evidence, the Board found that MSP had violated § 8(a)(1) of the Act by certain statements of Scott to the employees during the preelection campaign and after the election and by instituting changes in the working conditions of its employees on November 18, 1974.[9] The Board also found that MSP had violated §§ 8(a)(1) and (3) by reducing the hours of employees Filben, Erlacher, Olguin, Botello and Gonzalez; by requiring them to call in on a daily basis to determine if work was available for them; by laying these men off and discharging Filben because of their Union activities; and by refusing to grant a wage increase to another employee, Douglas Halter, because of his union activities.

The Board's order required MSP to cease and desist from the unfair labor practices found and to post the usual notices. It also ordered MSP to offer immediate and full reinstatement to employees Filben and Olguin and to make them, as well as Erlacher, Botello and Gonzalez, whole for any loss of earnings they may have suffered as a result of the discrimination against them. The Board refused to issue a bargaining order because it concluded that such an order, although otherwise justified by MSP's unfair labor practices, was not warranted since the Union had won the election and had been certified by the Board.

MSP's petition challenges the Board's findings with respect to the reduction in hours and layoffs of the five employees and the denial of a wage increase to Halter and attacks the propriety of the reinstatement and back pay provisions in the order. The Union's petition is concerned with the Board's refusal to grant a bargaining order. The Board argues in support of its findings and asks enforcement of its order.

II

*Review of the Board's findings of unfair labor practices*[10]

The administrative law judge found that MSP:

. . . changed its policy of avoiding layoffs by providing make-work tasks, and resorted to reduction in hours of work, call-in requirements and layoffs, in

---

Department was reduced from four to two on Dec. 12, 1974, and to three on the date of the hearing. (R. 747–48; 1641, G.C.Ex. 4).

8. The administrative law judge found that: "[i]n view of results of the election held on November 15, . . . it is highly improbable that the letter would not have been brought to Scott's attention prior to December 2." (R. 2301).

9. The administrative law judge had found that the rules announced by Scott on the morning of November 18 were not "changed working conditions." (R. 2294–99). The Board disagreed and instead found that the (1) ban on unnecessary talking and visiting, (2) the staggering of lunch periods and (3) the discontinuance of free coffee were violations of § 8(a)(1). (R. 2352). MSP has chosen not to seek review of this aspect of the Board's order so as to "simplify and focus the issues before this Court." Brief for Petitioner, 4. The Union evinces some concern that this concession on the part of MSP

will in some way limit our review of the Board's order and calls upon this Court to review the entire record. Brief of Intervenor, 5–6. We believe this concern to be unfounded for it is well settled that our determination as to whether the Board's findings are supported by substantial evidence is made with respect to the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456.

10. As discussed previously, note 8, *supra*, MSP has not petitioned for review of the Board's findings of unfair labor practices with respect to the changes in working conditions. MSP has also apparently decided not to seek review of the Board's findings that certain statements by Scott to Olguin, Botello and another employee, James Bentley, constituted violations of § 8(a)(1). Thus the Board's treatment of these issues is unnecessary. (See Brief for the National Labor Relations Board, 21–23).

whole or substantial part, in retaliation against its employees for designating the Union as their bargaining agent. (Decision, 33–34; R. 2323–24).

MSP essentially argues that this finding, adopted by the Board, is erroneous because (1) the Board applied an incorrect legal standard in evaluating MSP's defense of economic necessity, and (2) the finding is not supported by substantial evidence. We cannot agree.

## A

### 1. *MSP's defense of economic necessity*

In the hearings before the administrative law judge, MSP argued that the layoffs and reduction in hours policy instituted on November 18 were the result of economic necessity. The crux of petitioner's defense was that during the three months prior to the discharges the company had suffered net operating losses even though its net sales were increasing and were the highest in the company's history in October of 1974. MSP attributed this declining profitability to a relatively large increase in the number of its employees during this period.

The judge addressed MSP's contentions as follows:

> While the statistical data introduced by respondent may not be conclusive, the evidence is sufficient to warrant a finding that Respondent's action may have been economically justified. The issue, however, is whether, in changing its long-established policy of retaining employees during slack periods by assigning them to make-work tasks, Respondent was motivated solely by reason of economic necessity or, in whole or material part, by a purpose to retaliate against the employees for electing the Union as their bargaining agent. (Decision, 31; R. 2320).

The judge went on to find that MSP had been motivated, in whole or substantial part, by a purpose to retaliate against its employees for designating the Union as their bargaining agent, in disregard of MSP's exhortations and admonitions. (Decision, 34–35; R. 2323–24).

MSP argues that the administrative law judge and the Board erred in treatment of the economic necessity defense,[11] that the effect of the Board's decision is to hold that once union organizational activity has commenced, an employer has lost in perpetuity the right to respond to economic compulsion, and that the ruling runs counter to several cases dealing with such a defense, citing *inter alia, Bill's Coal Co. v. NLRB*, 493 F.2d 243 (10th Cir.); *NLRB v. Beech Aircraft Corp.*, 483 F.2d 51 (10th Cir.); and *Cain's Coffee Co. v. NLRB*, 404 F.2d 1172 (10th Cir.). (Brief for Petitioner, 21–24, *et seq.*) Relying on *Beech Aircraft*, MSP says that where a business justification for a layoff is established, the fact that the employer welcomed the opportunity to lay off a particular employee does not make the layoff discriminatory or unlawful. (Id. at 24).

██ Essentially MSP's argument is that if an economic justification is established, it constitutes a *per se* defense to such a charge by the Board, despite a showing of unfair labor practices. We feel that proof of a business justification does not have such an immunizing effect. Instead, when the employer has come forward with evidence of a legitimate motive for a dismissal, the effect is then to make it incumbent on the General Counsel to demonstrate explicitly that an improper motive "contributed to the discharge." *Cain's Coffee Co. v. NLRB, supra*, 404 F.2d at 1175–76. If it is established that an unlawful discrimination against those active in union affairs was a

11. We accept, as the Board apparently did, the administrative law judge's view that the proof was sufficient to warrant a finding that MSP's action may have been economically justified. We do so although the evidence introduced in support of this defense is incomplete and inadequate in some respects, a situation explicitly recognized by the judge. (R. 2318–20).

It is thus unnecessary for us to discuss the parties' various interpretations of MSP's financial data and other evidence of economic conditions with respect to our determination as to whether the Board's decision is supported by substantial evidence in the record as a whole.

partial motive for a discharge, there is a violation. *NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 1002 (10th Cir.); *S. A. Healy Co. v. NLRB,* 435 F.2d 314, 316 (10th Cir.); *Betts Baking Co. v. NLRB,* 380 F.2d 199, 203 (10th Cir.).

MSP says that the Board and the Union rely on the untenable proposition that "any indication" of anti-union animus is sufficient for a finding of a violation. (Reply Brief of Petitioner, 6). We do not feel that the opinions of the Board and the administrative law judge evince such a view. The judge's view, implicitly adopted by the Board, was that the question is whether:

> . . . in changing its long-established policy of retaining employees during slack periods by assigning them to make-work tasks, Respondent was motivated solely by reason of economic necessity or, *in whole or material part,* by a purpose to retaliate against the employees for electing the Union as their bargaining agent. (Decision, 31; R. 2320) (Emphasis added).

We feel that the test applied—whether there was improper motivation "in whole or material part"—is proper and not unreasonable. See *NLRB v. Associated Naval Architects, Inc.,* 355 F.2d 788, 792 (4th Cir.).[12]

Cases such as *Bill's Coal Co., Inc. v. NLRB, supra,* 493 F.2d 243, *NLRB v. Beech Aircraft Corp., supra,* 483 F.2d 51, and *Cain's Coffee Co. v. NLRB, supra,* 404 F.2d 1172, do not support MSP's position or call for rejection of the test applied by the administrative law judge. In *Bill's Coal Co.,* where an economic justification for layoffs was demonstrated, we rejected the evidence that the discharges were discriminatory and said the circumstances must do more than create just a suspicion or surmise of discrimination and must amount to substantial evidence from which an inference of discrimination may be drawn. 493 F.2d at 247. In that case we examined the evi-

dence as to whether a discriminatory layoff was established and did not treat the admitted economic justification as a *per se* defense.

MSP also relies on *Cain's Coffee Co. v. NLRB, supra,* 404 F.2d 1172, as supporting its position on its economic justification defense. However, there we stated (id. at 1175–76):

> . . . when the employer has come forward with evidence to establish a legitimate motive for the dismissal, *it is incumbent upon the General Counsel to then explicitly demonstrate that an improper motivation contributed to the discharge. Failing this,* the presence of legitimate business reasons underlying the dismissal is sufficient to preclude a finding of discrimination. (Emphasis added).

Again the showing of an economic justification was not treated as conclusive, but as making it incumbent on the General Counsel to demonstrate that the improper motivation "contributed to the discharge."

■ *NLRB v. Beech Aircraft Corp., supra,* 483 F.2d 51, probably comes closer to supporting MSP's position than the other cases. There, in a case of undisputed economic necessity of a layoff, we said that if the discharge made was required by the seniority rule it simply could not be found that it resulted from displeasure over the employee's union activities, and the fact that Beech welcomed the opportunity to discharge the employee did not make the layoff discriminatory or unlawful. Id. at 55. However, "welcoming" the opportunity to discharge an employee and being motivated in whole or substantial part by a discriminatory purpose, as was found here, are not the same. Moreover, these circumstances in the *Beech* case are not easily compared to those of MSP where there was a history of avoiding layoffs by the policy of assigning workers to make-work tasks

---

12. An even stricter test is indicated in *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 466 & n.8 (1st Cir.), that is, whether the discriminatory motive "predominates." We feel, however, that the test as stated by the administrative law judge and applied in this case is in accord with our decision in *NLRB v.*

during slack periods,[13] and where it was found that this policy was changed, in whole or substantial part, in retaliation against the employees for designating the Union as their bargaining agent.

In sum, we see no error in the test applied by the administrative law judge and the Board, namely, whether the employer was motivated in the change of policy solely by economic necessity or, in whole or material part, by a purpose to retaliate against the employees for electing the Union as their bargaining agent.

### B

*The sufficiency of the evidence to support the Board's findings*

This brings us to the question whether the Board's findings against MSP are supported by substantial evidence as contained in the record in its entirety. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

### 1. *The layoffs of Filben, Erlacher and Olguin*

█ MSP principally relies upon a defense of economic necessity to justify the layoffs of employees Filben, Erlacher and Olguin. As we have noted, the Board accepted the view of the administrative law judge that the evidence was sufficient to warrant a finding that MSP's action may have been economically justified. However, after weighing all the evidence the judge concluded, in findings adopted by the Board, that MSP "changed its policy of avoiding layoffs by providing make-work tasks, and resorted to reduction in hours of work, call-in requirements and layoffs, in whole or substantial part, in retaliation against its employees by designating the

Union as their bargaining agent, in disregard of Respondent's exhortations and admonitions." (R. 2323–24).

The company's no-layoff policy was clearly established in the record, and this policy was repeatedly stressed to the employees during the pre-election period. Despite this policy, once the results of the election were announced an immediate decision was made to layoff employees and to institute reductions in hours for some employees. (R. 1008, 1037) [14]

Furthermore, the Board's characterization of the layoffs as retaliation for union activities is also amply supported in the record. For example, Filben, Erlacher and Olguin were known union supporters and had attended and spoken out at the company's pre-election meetings. At one such meeting, Filben challenged Scott's explanation of MSP's profit sharing plan and gave his own version of it to assembled employees. At another, Erlacher commented that MSP pressroom conditions were unacceptable and would not have been tolerated in his native Germany. Additionally, after the election but prior to December 2, 1974, Filben, Erlacher and Olguin were named in a letter from the Union to all employees as members of the union committee which was to represent the Union in its negotiations with MSP. (R. 1626). The administrative law judge concluded that it was "highly improbable" that this letter could have escaped the company's attention. (R. 2301).

When the change in lay-off policy, the timing of the layoffs, the outspoken union support of Filben, Erlacher and Olguin, and the coercive statements by MSP management are weighed together, there is substantial support for the Board's findings. MSP's challenge to these findings and its argument that selection of employees for layoff was made in a non-discriminatory

---

*Montgomery Ward & Co., Inc., supra*, 554 F.2d at 1002 and our other opinions cited earlier.

**13.** Such a history of neither laying off employees nor cutting back work in lean months is

relevant. See *NLRB v. Lively Service Co.*, 290 F.2d 205, 207 (10th Cir.).

**14.** Timing is an important factor in determining the validity of an inference of discrimination.

**176**

manner and in a company-wide action [15] do not persuade us that the finding as to these employees was error.

## 2. The layoffs of Botello and Gonzalez

MSP argues that the Board's conclusion that employees Botello and Gonzalez were laid off for discriminatory reasons is unsupported since the record contains no evidence linking Botello and Gonzalez with the Union or showing that MSP's supervisory personnel were aware of any union activities on their part.

█ It is true that generally an employer's knowledge of his employee's union activity is a prerequisite to establishment of a discriminatory layoff or discharge. *Bill's Coal Co., Inc. v. NLRB, supra,* 493 F.2d at 246–47. However, circumstances may be such that a violation can be shown without proof of the employer's awareness of the opinions of individual employees. For instance, a power display in the form of a mass layoff, where made for an unlawful purpose to discourage union membership, may establish a violation "even if some white sheep suffer along with the black." *Majestic Molded Products Inc. v. NLRB,* 330 F.2d 603, 606 (2d Cir.); see also *NLRB v. Brown-Dunkin Co.,* 287 F.2d 17, 19, 20 (10th Cir.).

█ A finding based on reasoning similar to that in the *Majestic Molded Products* case was made here by the administrative law judge and adopted by the Board without comment. (See note 15, *supra*). In view of that finding and the substantial evidence of anti-union animus already discussed, we are satisfied that the findings with respect to Botello [16] and Gonzalez are amply supported.

*NLRB v. Montgomery Ward & Co., Inc., supra,* 554 F.2d at 1002.

15. The administrative law judge found that MSP was not so much concerned with individual activities of employees as with the fact that a majority of the employees voted for the Union and that it was determined to punish them for exercising their right of self-determination. (Decision, 36).

## 3. The denial of a wage increase to Douglas Halter

The administrative law judge found that MSP "had not discriminated in regard to the hire and tenure of employment of Douglas Halter." (R. 2329). The Board partially reversed this finding and found that Halter had been discriminatorily denied a wage increase on or about the end of November, 1974, in violation of §§ 8(a)(1) and (3). MSP argues that the Board's conclusion is not supported by substantial evidence. We must agree.

Halter, a typesetter by vocation, was hired on October 31, 1974, to work in the bindery at a starting rate of $4.25 an hour. Halter testified that Ewing told him that his wage rate would be reviewed in two weeks, while Ewing testified that he merely told Halter that under company policy his wages would be reviewed in three months.

Late in November or early in December, Halter met with Scott, Johnson and Ewing for the first time to review his wages. Halter testified that during the discussion, Scott commented on the fact that Halter had worked exclusively in union shops and declared "Let the [expletive deleted] union get your raise." (R. 450); that when Halter protested that he was being discriminated against because of his union background, Scott countered that the company could not grant him a raise because it was involved in a union organizational campaign; and that in the ensuing discussion about the pros and cons of unionism, Scott maintained that Halter's previous employer had been forced into bankruptcy because it was a union shop and stated that if the Union were successful at MSP, employees like James Bentley, a friend of Halter's who had recommended that MSP hire Halter, would end up losing

16. Actually, in the case of Botello the record shows some management awareness of Botello favoring the Union. There were findings that MSP's chief management officer, Mr. Scott, made statements about Botello having "voted for the union." (Decision, 21, 34). The record supports these findings. (R. 386–90). This portion of the judge's findings was adopted by the Board without comment.

money because he would be unable to qualify as a journeyman pressman. (R. 451–52).

All three management officials denied that Scott made the remark attributed to him by Halter about letting the Union obtain his raise, but did not deny Scott's remaining remarks. (R. 852, 1215–16, 1312). Johnson did, however, acknowledge that Scott had stated that if the union were certified, future raises would be negotiated by the Union and not individual employees. (R. 1193).

The administrative law judge found that:

It is found that Scott did, in fact, make the statements attributed to him by Halter, which were consistent with Scott's attitude on unionism as manifested in his statements to employees both before and after the election. Scott's remarks to Halter on the occasion in question, while manifesting his displeasure with the efforts at self-organization of the employees, contained no threat of reprisal or promise of benefit, and, therefore, were not violative of Section 8(a)(1) of the Act.

\* \* \* \* \* \*

The preponderance of the credible evidence fails to establish that, at the time Halter was hired, Ewing told him that he would receive a wage review, much less a wage increase, after 2 weeks.

\* \* \* \* \* \*

As to Scott's remark about letting the Union get him a raise, while it may indicate the measure of Scott's antipathy toward unions, it is insufficient to establish that Halter was denied a raise because of his staunch union adherence. Moreover, the fact that Scott did, in fact, grant Halter a raise of 25 cents an hour in January, albeit as a reward for working the late shift on [a large] Government contract, negates a discriminatory motive in denying him the raise in November. (R. 2313, 2315, 2316).

17. The Board did not disagree with the judge's other findings that Halter had been hired only as a temporary employee and had not been discriminated against with respect to his eventual layoff.

The Board disagreed with the judge and found that Scott's statement to Halter did constitute a threat of reprisal and thus violated § 8(a)(1) of the Act. (R. 2350–51). The Board, despite the language quoted above, also asserted that the judge "did not specifically conclude whether Ewing had in fact promised Halter that he would be reviewed within 2 weeks" and went on to find that "Ewing did in fact promise to review Halter's wages." (R. 2350). It then coupled this promise with Scott's statement and concluded that Halter was discriminatorily denied a wage increase.[17] Id.

■ It is clear from the administrative law judge's opinion that he did find that it had not been established that Ewing had promised Halter a wage review in two weeks and that this finding was based on his assessment of the credibility of Ewing and Halter. In view of these circumstances and the absence of other substantial evidence to support the Board's finding,[18] we hold that the Board's finding that Ewing had promised Halter a wage review in two weeks is unsupported by substantial evidence. *Universal Camera Corp. v. NLRB, supra,* 340 U.S. at 496–97, 71 S.Ct. 456. On the other hand, we hold that the Board's finding that Scott's statement constituted a threat of reprisal was not error for it is the Board's duty to make the final determination as to whether the Act has been violated. *Groendyke Transport, Inc. v. NLRB,* 530 F.2d 137, 139 (10th Cir.).

The Board's finding that Halter was discriminatorily denied a wage increase rests largely on the weight given to Scott's remark. Though we sustain the Board's finding that this remark did constitute a threat of reprisal within the meaning of § 8(a)(1), we cannot agree that the remark alone is also sufficient to support the conclusion that Halter was discriminatorily denied a wage increase. The Board's analysis does not deal with the bulk of the evidence with respect to the relations between Halter and

18. The only other evidence offered in support of its finding is the fact that a wage review did occur about a month after Halter started work.

the MSP management (Scott, Johnson and Ewing) which was explored at length in the administrative law judge's opinion (R. 2312–16). Furthermore, there is no other substantial evidence of anti-union animus directed at Halter.

In circumstances such as these, where there is insubstantial support for the Board's inference that anti-union animus motivated the employer's action, we must accord respect to the contrary inference drawn by the administrative law judge. *Cain's Coffee Co., supra,* 404 F.2d at 1176; see *Universal Camera Corp., supra,* 340 U.S. at 496–97, 71 S.Ct. 456. Accordingly, we hold that the Board's conclusion that Halter was discriminatorily denied a wage increase is not supported by substantial evidence.

### C

*The revocation of the subpoena to NLRB field examiner John Sayre*

During the hearing, Olguin testified to the following conversation with Scott:

> [Scott] said: 'Do you think I'll negotiate with the Union,' and I said 'Probably not,' and he said 'Right'. (R. 306).

This statement does not appear in Olguin's pre-hearing Board affidavit which had been taken by John Sayre, a board agent. (R. 2200–02). However on cross examination, Olguin stated that he had told Sayre of these statements "three or four times" but Sayre had failed to include them in the affidavit. (R. 332–34).

MSP then caused a subpoena *ad testificandum* to be issued to Sayre and, pursuant to the procedures mandated in 29 C.F.R.

§ 102.118(a) (July 1, 1975),[19] requested the General Counsel's permission so that Sayre could testify. This permission was denied and the subpoena was revoked. (R. 2186). MSP contends that the only procedure by which MSP could obtain a fair and reasonable opportunity to verify the accuracy of Olguin's testimony was by examination of Sayre, that granting the request for such testimony was essential to fairness and due process, and that a narrow exception to the governmental privilege was therefore essential since the statement by Mr. Scott in question was a critical part of the case.

In his telegram refusing to grant permission for the board agent to testify and in his petition to revoke the subpoena, the General Counsel sought to invoke a privilege based on a policy that the investigating agent's role would be impaired by the likelihood of becoming a material witness.[20] See *Stephens Produce Co., Inc. v. NLRB,* 515 F.2d 1373, 1377 (8th Cir.). However, the mere incantation of such a privilege is not conclusive, as the *Stephens Produce* opinion states. Id. at 1377. And the hearing tribunal and the courts, not the adversary General Counsel, have the responsibility for deciding whether such a privilege is available. *NLRB v. Capitol Fish Co.,* 294 F.2d 868, 876 (5th Cir.). In this case, however, we have considered the claim of error and have decided, for reasons that are stated below, that in any event there was no prejudice shown in connection with the revocation of the subpoena. Hence, we need not decide the scope or availability of such a privilege.

**19.** 29 C.F.R. § 102.118(a) (July 1, 1975) provides in relevant part:

> . . . no . . . field examiner . . shall . . . testify in behalf of any party to any cause pending in any court or before the Board, . . . with respect to any information, facts or other matter coming to his knowledge in his official capacity . . , whether in answer to a subpoena or otherwise, without the written permission of the . . . general counsel . . .

Though dated July 1, 1975, these regulations were in effect during the hearings in April of 1975.

**20.** The petition and the telegram from the General Counsel referred to a policy that ordinarily permission is not granted for Board investigating agents to testify. It said the reason for the policy is that the highly sensitive and delicate role of the agent would be impaired if a real likelihood existed that the agent would be enmeshed as a material witness, and that this request for the testimony showed no basis for departure from the policy. (R. 2185–86).

It is true that the judge found that Scott made the statement attributed to him by Olguin and he found also that Olguin's testimony was not successfully impeached by the absence of the conversation from the pretrial affidavit. (R. 2307). Thus a further challenge to Olguin's testimony (*i. e.* that he had told the agent several times about Scott's statement) by any testimony from the agent that Olguin did not relate such statements by Scott would have likely aided MSP. Nevertheless, this anti-union statement of Scott was not found individually to constitute a violation of § 8(a)(1). This statement was similar to the one attributed to Scott by Bentley, (R. 2307), and it was one of several statements tending to establish anti-union animus. Thus, we are satisfied that disbelief of this one statement having been made would not have had any substantial effect on the judge's conclusion, which the Board accepted, that Scott's "numerous statements . . . interfered with, restrained and coerced employees in the exercise of rights guaranteed by the Act, thereby violating Section 8(a)(1) of the Act." (R. 2326, 2346, 2353).

We conclude that no prejudicial error in the ruling on the subpoena is demonstrated.

### III

#### Remedies

#### A

*The order for reinstatement and back pay*

MSP challenges the appropriateness of the Board's order that Filben and Olguin be reinstated and that they, along with Erlacher, Botello and Gonzalez,[21] be made whole for any loss in pay suffered as a result of the unfair labor practices found. MSP ar-

gues it would be inappropriate to grant these remedies since to do so would be a punitive action against MSP without giving proper weight to its economic difficulties. (Brief of Petitioner, 36). And MSP further contends that these remedies are improper because, irrespective of any discriminatory intent, it is clear that Filben, Erlacher, Olguin, Botello and Gonzalez would have been laid off in November, 1974, due to the company's economic problems. (Id. at 37).

MSP presses this argument based on its economic difficulties as a complete bar to any reinstatement or back pay remedies. (See Brief for Petitioner, 33 *et seq.*). However, the finding of an unfair labor practice and discriminatory discharge is presumptive proof that some back pay is owed by the employer. See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420 n.12, 95 S.Ct. 2362, 45 L.Ed.2d 280; *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 178 (2d Cir.), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682. Furthermore there is significant evidence in the record weighing against MSP's argument that its economic difficulties serve as a complete bar to any remedial order for reinstatement and back pay. There is proof that not only was work available for laid off and discharged employees, but also that in some instances, new employees were hired during the period of "substantial economic difficulties," (Brief for Petitioner, 36), to do work formerly done by discharged employees. See *NLRB v. Armcor Industries*, 535 F.2d 239, 243 (3d Cir.). These circumstances, and the fact that there had never been a layoff in the company's history, tend to support the Board's order for reinstatement and back pay. Although the case is close as to Filben,[22] we are persuaded that the record as a whole supports the Board's order for rein-

---

**21.** Erlacher and Gonzalez had returned to full-time work as of the date of the hearing while Botello had refused an offer of reinstatement. (R. 2305, 2310–11).

**22.** We must agree the case is close as to Filben because elimination of the full-time platemaking position he held was being considered before the start of the union campaign and was recommended in an efficiency study. However, as the administrative law judge noted, the

validity of the study was open to some question. (See R. 2318–23). We note too that other employees, including one recently hired, engaged in platemaking after Filben's layoff and discharge, (R. 261–62, 276, 429–30, 518, 520–21, 578–81, 596, 1161–63), and there had never been a layoff at the company before. We feel the record as a whole does support the reinstatement and back pay order as to Filben.

statement of Filben and Olguin and for back pay for those two employees and for Erlacher, Botello and Gonzalez. The order should stand since it is not shown that it is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act. *NLRB v. J. H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 24 L.Ed.2d 405.

For these reasons we cannot agree that MSP's economic difficulties would serve as a complete bar to the remedial order for reinstatement and back pay. However this does not end the matter. With respect to back pay there will be determinations of the proper amounts to award in accordance with the Board's procedures. See 29 CFR § 102.52, *et seq.* In the compliance proceeding the company has the right to present evidence that jobs were not available for the discriminatees during the back pay period. Back pay is awarded only for the period during which the worker would have worked in the absence of discrimination. See *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 199 n.7, 61 S.Ct. 845, 85 L.Ed. 1271; *NLRB v. Mastro Plastics Corp., supra*, 354 F.2d at 175. The burden will be on the company to establish that it would not have had work available for the discriminatees due to factors unrelated to the discriminatory discharges,[23] or that the discriminatees incurred any willful loss of earnings. *NLRB v. Mastro Plastics Corp., supra*, 354 F.2d at 174.

In connection with the compliance proceeding we note one apparent problem. The Board's order requires MSP to make the five employees "whole for any loss of earnings they may have suffered by reason of the discrimination against them, in the manner set forth in the section of the Administrative Law Judge's Decision entitled 'The Remedy.'" (Board Order, 10; R. 2354). The Order thus adopted the Administrative Law Judge's Decision, (p. 38, R. 2327), which stated that the "periods of back pay for which each of said employees

shall be made whole is as follows . . .", then giving specified periods for each employee. This provision appears to preclude proof by MSP that jobs were unavailable in the given periods.

The Board's order should stand, we feel, as to reinstatement and as to granting back pay, in principle, as a remedy. But we feel we should modify the Order and the Judge's Decision it adopts to state that in the compliance proceeding back pay will be considered and determined with respect to the periods specified in the Judge's Decision, the employer being entitled however to present proof of unavailability of work, willful loss of earnings and similar defensive proof in accordance with the Board's usual procedure. See *NLRB v. Mastro Plastics Corp., supra*, 354 F.2d at 174–75.

## B

### *The bargaining order issue*

The Union argues that the Board erred in refusing to issue an order, as recommended by the administrative law judge, requiring MSP to bargain with the Union.

The Union sought a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547. The judge noted that this case differs from *Gissel* in that here the unfair labor practices occurred after, rather than before, the election. Furthermore, here, unlike *Gissel*, the Union won and was already certified. The judge nonetheless felt that the "pervasive" nature of the unfair labor practices justified a "logical extension of the *Gissel* holding" and recommended a bargaining order. The Board agreed that the practices were sufficiently pervasive to justify a bargaining order but found, with one member dissenting, that the order was unnecessary since the Union had been certified.

The Union argues that MSP's pervasive discriminatory practices require such an order, and that it is anomalous to give a lesser remedy where the Union succeeded in win-

**23.** A finding of discriminatory discharge carries with it the implication that suitable employment was available and the employer has the

burden to overcome such a prima facie case. See *NLRB v. Flora Construction Co.*, 354 F.2d 107, 108 (10th Cir.).

ning the election, despite the illegal conduct. It further argues that such an order is appropriate where the Union has had its strength diminished through layoff of its key support, thus denying it the opportunity to bargain effectively, from a position of full strength, during the year following its certification.[24]

We cannot agree. The Board is vested with considerable discretion in deciding whether such an order is appropriate and we are not at liberty to substitute our judgment for that of the Board, even if our appraisal of the matter differs. *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739, 743 (10th Cir.). If there has been a refusal to bargain in good faith, it may be reasonable and proper to extend the certification year. *NLRB v. Burnett Construction Co.*, 350 F.2d 57, 60 (10th Cir.). We feel the Board was within the bounds of its discretion in not entering a *Gissel* bargaining order since certification and a duty to bargain already exist.

Accordingly, the Board's order will be modified by setting aside the findings and relief granted as to the denial of a wage increase to Douglas Halter; the order will be modified as noted with respect to permitting the employer to present proof of unavailability of work and other defensive matter in the compliance proceeding; otherwise the findings and order of the Board are sustained and enforcement of the order as modified will be granted.

**24.** The Union says it will have lost the advantage of the conclusive presumption of majority status which expired one year after the certification on May 21, 1975, before compliance is achieved.